706 S.E.2d 354

**Donna F. WILSON, Petitioner Below, Appellant**

v.

**Leon Hunter WILSON, Respondent Below, Appellee.**

No. 35475.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 2010.

Decided Nov. 23, 2010.

Dissenting Opinion of Chief Justice Davis Nov. 30, 2010.

**160**

James P. Campbell, Esq., Mary Binns–Davis, Esq., Campbell Flannery, P.C., Leesburg, VA and G. Nicolas Casey, Jr., Esq., Lewis Glasser Casey & Rollins, PLLC, Charleston, WV, for Appellant.

Charles F. Printz, Jr., Esq., Julie R. Shank, Esq., Bowles Rice McDavid Graff & Love LLP, Martinsburg, WV and Cinda L. Scales, Esq., Martinsburg, WV, for Appellee.

WORKMAN, Justice:

The appellant, Donna F. Wilson,[1] ex-wife of appellee, Leon Hunter Wilson, appeals the June 4, 2009, order of the Circuit Court of Berkeley County. In that order, the circuit court denied Ms. Wilson's motion for reconsideration[2] of the court's March 25, 2009, order which reversed the November 21, 2008, final divorce order of the Berkeley County Family Court and remanded the case to the family court for further proceedings. In the March 25, 2009, order, the circuit court reversed the family court's finding that set the net value of Mr. and Ms. Wilson's business at $8,927,957.00, which included a valuation for enterprise goodwill. More specifically, the circuit court reversed a finding by the family court which ordered Mr. Wilson to pay Ms. Wilson the sum of $4,914,582.50, and instead, ordered Ms. Wilson to pay Mr. Wilson the sum of $894,286.00 within thirty days of judgment. Based upon the parties' briefs and arguments in this proceeding, a review of the entire record, and the relevant statutory and case law, this Court reverses the circuit court's June 4, 2009, order, and affirms, in part, and reverses, in part, the circuit court's March 25, 2009, order, and remands the case to the family court for further proceedings consistent with this opinion.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Mr. Wilson and Ms. Wilson (collectively, "the parties") were married in 1990 and separated on May 31, 2005. They had no children as part of the marriage. Both parties were involved in aspects of real estate development prior to and during their marriage. In 1993, the parties formed Hunter Company of West Virginia (hereinafter, "Hunter")[3] to conduct real estate development; each party separately owned one half of the stock. Both parties agree that Hunter is a highly successful business which generated a net income to the parties of nearly $12 million in 2004, and more than $5 million in 2005.

Beginning in 1993, Hunter was chosen by National Land Partners (hereinafter, "NLP") to manage real estate development projects

---

1. Ms. Wilson was restored to her premarital name of Donna F. Miller on November 10, 2008, as a part of the divorce proceedings before the family court.

2. Ms. Wilson's motion for reconsideration was filed pursuant to the West Virginia Rules of Civil Procedure Rule 59(e), which provides: "Motion to Alter or Amend a Judgment. Any motion to alter or amend the judgment shall be filed not later than 10 days after entry of the judgment."

3. According to Kenneth Apple, the expert hired by Ms. Wilson, the parties formed the Hunter corporation in April 24, 1997, but did not utilize it until January 1, 2004. Prior to that, the business operated as a sole proprietorship. Mr. Apple testified that Hunter is an S Corporation which he explained as follows:

> A regular corporation or any corporation files its own tax return and pays its own income taxes. If the corporation elects S status with the Internal Revenue Service, that instead of the corporation paying its own income taxes, it passes through its net profits or losses to the shareholders, and they put that income or loss on their own tax return and pay taxes on it at an individual level.

in West Virginia, which was accomplished through successive Management Agreements. NLP, whose headquarters is in Williamstown, Massachusetts, is involved in large tract real estate development and does business in eleven states. In West Virginia, NLP owns and has financial responsibility for all of its projects. The agreement between Hunter and NLP provides that Hunter is an independent contractor. Hunter does not own any of the real estate involved in any of the projects [4] as NLP buys the real estate through one of its wholly-owned subsidiaries.[5] NLP also utilizes Inland Management, another one of its wholly-owned subsidiaries, to employ the people who work for NLP, to provide all of the accounting services for the projects, and for other services associated with the financial aspects of completing a project.

Under the Management Agreement, Hunter's duties are to identify property that would qualify for development, and complete due diligence and feasibility studies to determine if NLP should purchase the property. If NLP purchases the property, Hunter then conducts engineering and design work, obtains all permits and subdivision approval, and oversees the construction of the infrastructure. Upon completion of the road system and utilities, Hunter then hires a sales force,[6] conducts advertising, marketing, and other promotions, sells all of the building lots, and oversees the closings of properties with the attorneys. Under the Management Agreement, typically at the end of the project, Hunter is paid a manager fee which is defined as any "net profit" remaining after twelve-and-one-half-percent of the gross sales are paid to NLP and all other expenses are paid. If NLP's preferential payment of twelve-and-one-half-percent exceeds the total net profit, Hunter receives no compensation.[7]

On June 1, 2005, Ms. Wilson filed for divorce.[8] The parties, however, stipulated to May 31, 2005, as their date of separation. At the time of the parties' separation, Hunter was the manager of six real estate development projects for NLP at various stages of completion.[9] Ms. Wilson was no longer involved in Hunter's business at that time. By May 2008, the parties had divided their personal property and identified and stipulated to the value and distribution of all of their marital assets and debts, except for the calculation and valuation of Hunter's manager fees. The stipulated net marital estate, absent the valuation of Hunter, was $9,536,682.14,[10] and Mr. Wilson had advanced

---

4. Ms. Wilson explained that she did not know that Hunter did not have ownership in any of the properties until after the parties separated and commenced divorce proceedings.

5. NLP utilizes several subsidiary companies to conduct its business. For instance, NLP formed WV Hunter LLC, a company solely owned by NLP, to take title in the land purchased for the various West Virginia land projects managed by Hunter. WV Hunter LLC is an entirely separate entity from Hunter Company of West Virginia (Hunter). While the two company's names are similar, Mr. and Ms. Wilson have no interest in WV Hunter LLC. Their sole interest is in the separate company they formed known herein as Hunter. Moreover, neither Mr. Wilson, Ms. Wilson, nor Hunter, own any equity interest in NLP, any of NLP's subsidiaries, or in any of the properties which Hunter manages. As such, any mention of "Hunter" in this opinion is solely a reference to the Hunter which the parties jointly own.

6. As discussed herein, the persons hired by Hunter are employees of NLP.

7. According to the record, Hunter has always realized a profit with each of its projects by the date of completion.

8. Ms. Wilson's petition for divorce is dated May 31, 2005; however, the circuit court date stamped the petition on June 1, 2005.

9. As will be discussed in more detail later in this opinion, the record is not consistent regarding the number of active projects which had begun prior to the parties' separation. For example, in a May 12, 2005, "Joint Trial Order," the family court states: "The parties agree there were four (4) said projects as of the date of separation, being Overlook at Greenbriar, The Springs a[t] Shepherdstown, West Vaco I and The Point. Petitioner alleges there may be another West Vaco project." That same language is included in the family court's May 8, 2008, pretrial order, while the family court's November 21, 2008, order references five projects. Nonetheless, without any discussion or explanation, the circuit court, through its March 25, 2009, order, states as fact numerous times that there were six pending projects at the time of separation.

10. Excluding the contested value of Hunter's manager fees, the parties agreed that the marital assets were valued at $11,587,324.02, less $2,050,641.88 in marital debts, for a net total of $9,536,682.14.

Ms. Wilson $4,317,737.62 towards her share of the marital estate. Accordingly, the sole issue in contention that was litigated before the family court was the valuation of Hunter's manager fees on the projects that existed at the date of separation for purposes of equitable distribution. The difficulty is that each party and each judicial officer attempted to frame the issue of the fees in the context of whether they constituted enterprise goodwill or personal goodwill. In fact, under our jurisprudence, they are neither. Instead, they are a separate item for division before any consideration to goodwill is even discussed.

During the proceedings before the family court, Ms. Wilson presented expert testimony on the valuation of Hunter's manager fees. Ms. Wilson's expert, Kenneth Apple, a certified public accountant (CPA), projected the manager fees at $8,927,959.00 as of the date of separation and opined that such value was entirely "enterprise goodwill," and thus, the entire amount was subject to equitable distribution. While Mr. Wilson did not offer an expert with regard to the manager fees, he did present evidence through NLP financial records and the testimony of Alan Murray,[11] NLP's chief financial officer, who is also a CPA, and through Joan Holtz, a CPA for Hunter. Through such evidence, Mr. Wilson argued to the family court that due to project construction spending as well as premature payments and overpayments of manager fees by NLP, that as of the date of separation, Hunter's manager fees had a negative value of $(2,680,672.00), and that two of the "five"[12] real estate development projects had not been completed.

On November 21, 2008, the family court entered a final order and adopted the valuation of the manager fees as opined by Mr. Apple, and concluded that Hunter possessed "enterprise goodwill," which was subject to equitable distribution. In doing so, the family court concluded that the evidence supported a finding that the Management Agreement between Hunter and NLP created independent value of Hunter separate and apart from the abilities and skills of Mr. Wilson, and that Hunter would continue to have value beyond its existing accounts and physical assets even if Mr. Wilson were dead. The family court's finding of enterprise goodwill was based primarily on the testimony of Mr. Apple, which the family court interpreted as concluding that Hunter had enterprise goodwill, in part, based upon a highly compensated workforce of approximately twenty employees. The family court then ordered Mr. Wilson to pay Ms. Wilson the additional sum of $4,914,582.50 and awarded judgment in that amount.[13]

█ Mr. Wilson thereafter filed a motion for reconsideration with the family court which was denied on December 23, 2008. Mr. Wilson then filed an appeal with the Circuit Court of Berkeley County. On March 25, 2009, the circuit court reversed the final order of the family court. The circuit court reversed the family court's finding that Hunter's manager fees were valued at $8,927,957.00 at the time of separation and found that such fees were actually a negative $(2,196,915.00). Accordingly, the circuit court found that the net marital estate at the time of separation was $6,886,304.00, an amount lower than a prior stipulated amount by the parties.[14] The circuit court then

11. Mr. Murray testified during the May 9, 2008, hearing that he was also employed by Inland Management, a wholly owned subsidiary of NLP. He further explained that he became a CPA in 1970 and that he had practiced as a CPA until 1986 when he entered the land development business.

12. *See* note 9, *supra.* Mr. Wilson argued at that time that there were five total projects, two of which were active, but unfinished at the time of the parties' separation; yet in his brief before this Court he argues there were six total active projects underway at the time of separation, with two of those projects remaining unfinished.

13. This award was separate from the prior award of $4,317,737.62 received by Ms. Wilson as a result of the parties' stipulated value attached to the net marital estate, which did not include the valuation of Hunter.

14. "For purposes of equitable distribution, W.Va. Code, 48–2–32(d)(1) (1984), requires that a determination be made of the net value of the marital property of the parties." Syllabus Point 2, *Tankersley v. Tankersley*, 182 W.Va. 627, 390 S.E.2d 826 (1990).

found that Ms. Wilson's prior receipt of an advanced payment towards equitable distribution in the amount of $4,337,438.00 resulted in an overpayment of $894,286.00. The circuit court then ordered Ms. Wilson to pay Mr. Wilson that amount with interest within thirty days. The circuit court also remanded the case to the family court to exercise continuing jurisdiction over the projects known as The Point and WestVaco. In doing so, the circuit court ordered that upon completion of those projects,

> the family court shall effect a supplemental equitable distribution in accordance with W.Va.Code § 48–7–104(I), i.e., the marital share of any manager fees earned or loss taken is based upon the percentage of construction spending for each project at the time of separation being 8.2% for WestVaco and 2.3% for The Point.

Subsequently, Ms. Wilson filed a motion pursuant to Rule 59(e) of the West Virginia Rules of Civil Procedure asking the circuit court to alter or amend its March 25, 2009, order. On June 4, 2009, the circuit court denied such motion. Thereafter, Ms. Wilson filed an appeal with this Court.

## II.

### STANDARD OF REVIEW

This Court has held that: " 'In reviewing a final order entered by a circuit judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law de novo.' Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004)." Syllabus Point 1, *Staton v. Staton*, 218 W.Va. 201, 624 S.E.2d 548 (2005). *See* W.Va.Code § 51–2A–15(b) (2001). *See also*, Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a de novo standard of review."). With these standards in mind, this Court will now consider the issues presented in this case.

## III.

### DISCUSSION

This Court recognizes that there was significant confusion below regarding the manager fees and their proper valuation. Thus, it is necessary to clarify at the outset that the manager fees were separate and distinct from any determination of enterprise or personal goodwill. Instead, the manager fees have a separate value and both parties are entitled to a fair and reasonable determination of that value, separate and distinct from any discussion of Hunter's potential goodwill value. As will be explained thoroughly in section C of the discussion herein, Hunter's efforts prior to the parties' separation led to significant profits totaling millions of dollars paid at the completion of the various projects. Given the fact that there has not been a value placed on the fees for the six projects in existence at the time of the parties' separation, and in consideration of the fact that the record is void of any credible evidence for the lower court to make such an equitable determination, this case must be remanded for a proper valuation, separate and distinct from enterprise and/or personal goodwill.

In Section A, below, this Court will first examine the family court's error in its determination relating to any potential value of Hunter based upon goodwill. Next, in section B, the opinion points out the errors of the circuit court in its creation and application of a construction spending theory. Finally, in section C, the Court will clarify the confusion surrounding the manager fees and their value as an asset of the business separate and distinct from goodwill.

### A. Enterprise Goodwill v. Personal Goodwill

In her first argument, Ms. Wilson states that the circuit court committed reversible error by misapplying this Court's holding in *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003), on the issue of enterprise goodwill. Specifically, Ms. Wilson contends that the family court's finding of enterprise goodwill in relation to Hunter was firmly rooted in law, while the circuit court's subsequent re-

versal, and holding that Hunter only possessed personal goodwill, was against this Court's well-reasoned mandate of *May*.

In *May*, this Court recognized that businesses possess an intangible asset known as "goodwill." "Goodwill" may be defined generally as

> [T]he advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital stock, funds, or property employed therein, in consequence of general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

*McDiarmid v. McDiarmid*, 649 A.2d 810, 813 (D.C.App.1994) (citations omitted). *See also Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind.1999) (defining goodwill "as the value of a business or practice that exceeds the combined value of the net assets used in the business"). Essentially, goodwill is " 'the favor which the management of a business has won from the public, and probability that old customers will continue their patronage.' " *Gaydos v. Gaydos*, 693 A.2d 1368, 1372 (Pa.Super.1997) (quoting *Ullom v. Ullom*, 384 Pa.Super. 514, 559 A.2d 555, 558–59 (1989)). Further, marketable "[g]oodwill associated with a business is an asset distributable upon dissolution of a marriage." *Seiler v. Seiler*, 308 N.J.Super. 474, 706 A.2d 249, 251 (1998) (citation omitted). However, "[w]here no market exists for goodwill, it should be considered to have no value." *Manelick v. Manelick*, 59 P.3d 259, 265 (Alaska 2002). 214 W.Va. at 399, 589 S.E.2d at 541.

The *May* Court explained that "[e]ssentially, there are two types of goodwill recognized by courts in divorce litigation: enterprise goodwill (also called commercial or professional goodwill) and personal goodwill . . . ." *Id.* Ultimately, the *May* Court concluded that enterprise goodwill was marital property subject to equitable distribution. The Court explained that

> [e]nterprise goodwill attaches to a business entity and is associated separately from the reputation of the owners. Product names, business locations, and skilled labor forces are common examples of enterprise goodwill. The asset has a determinable value because the enterprise goodwill of an ongoing business will transfer upon sale of the business to a willing buyer.

(Citation omitted). *Id.* In contrast,

> [P]ersonal goodwill is associated with individuals. It is that part of increased earning capacity that results from the reputation, knowledge and skills of individual people. Accordingly, the goodwill of a service business, such as a professional practice, consists largely of personal goodwill.

(Citation omitted.) 214 W.Va. at 400, 589 S.E.2d at 542.

Ms. Wilson argues that Hunter clearly possesses enterprise goodwill. She maintains that product names, business locations, and skilled labor forces are common examples of enterprise goodwill that can be based upon established relations with employees, customers, and suppliers and can include a business location, name recognition, and a business's reputation. To this end, Ms. Wilson contends that Hunter has seven business locations and product names related to it, which proves the existence of enterprise goodwill. She states that one of the seven locations is a 17,000 square foot office in Martinsburg, West Virginia, where the majority of the twenty to twenty-five employees are located. Ms. Wilson claims that those employees are exclusively employees of Hunter. This, she maintains, is in addition to locations at six separate real estate projects throughout West Virginia. Ms. Wilson further argues that the extensive advertising spent to market the properties totaled more than $4.5 million and was clear evidence of enterprise goodwill.

In response, Mr. Wilson contends that the circuit court correctly applied *May* as the evidence clearly shows that Hunter does not have enterprise goodwill, which he argues is a value attributed to a business by virtue of its existing arrangements with suppliers, cus-

tomers, or others, and its anticipated future customer base due to factors attributable to the business. Mr. Wilson also maintains that Hunter does not have any employees or business locations that tend to give rise to enterprise goodwill. He further asserts that the circuit court correctly recognized that Hunter technically has no employees aside from Mr. Wilson himself. He contends that while he arranges for and directs employees working under his supervision, that they are employees of Inland Management, a subsidiary of NLP, which is Hunter's sole customer.

In determining that enterprise goodwill was subject to equitable distribution, the *May* Court explained that " '[T]he majority of states [24] differentiate between "enterprise goodwill," ... and "personal goodwill[.]" ' " (Citation omitted.) 214 W.Va. at 403, 589 S.E.2d at 545. The *May* Court noted that one of the leading cases discussing and adopting the distinction between personal goodwill and enterprise goodwill is the decision in *Yoon v. Yoon*, 711 N.E.2d 1265 (Ind.1999). In *Yoon*, the wife was granted a divorce from her husband. In granting the divorce the trial court assigned a value of $2,519,366.00 to the husband's medical practice. This figure included a value for goodwill. The husband appealed to a mid-level appellate court. There, the valuation was upheld. The husband then appealed to the state Supreme Court. In addressing the issue of goodwill, the Indiana Supreme Court stated:

> Goodwill has been described as the value of a business or practice that exceeds the combined value of the net assets used in the business. Goodwill in a professional practice may be attributable to the business enterprise itself by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business. It may also be attributable to the individual owner's personal skill, training or reputation. This distinction is sometimes reflected in the use of the term "enterprise goodwill," as opposed to "personal goodwill."

> Enterprise goodwill is an asset of the business and accordingly is property that is divisible in a dissolution to the extent that it inheres in the business, independent of any single individual's personal efforts and will outlast any person's involvement in the business. It is not necessarily marketable in the sense that there is a ready and easily priced market for it, but it is in general transferrable to others and has a value to others.

> . . . .

> In contrast, the goodwill that depends on the continued presence of a particular individual is a personal asset, and any value that attaches to a business as a result of this "personal goodwill" represents nothing more than the future earning capacity of the individual and is not divisible. Professional goodwill as a divisible marital asset has received a variety of treatments in different jurisdictions, some distinguishing divisible enterprise goodwill from nondivisible personal goodwill and some not.

> Accordingly, we join the states that exclude goodwill based on the personal attributes of the individual from the marital estate.

> [B]efore including the goodwill of a self-employed business or professional practice in a marital estate, a court must determine that the goodwill is attributable to the business as opposed to the owner as an individual. If attributable to the individual, it is not a divisible asset and is properly considered only as future earning capacity that may affect the relative property division.

*Yoon*, 711 N.E.2d at 1268–69 (citations omitted).

■■ Following an extensive discussion, the *May* Court held in Syllabus Point 2 that " '[e]nterprise goodwill' is an asset of the business and may be attributed to a business by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business." In Syllabus Point 3, the *May* Court explained that " '[p]ersonal goodwill' is a personal asset that depends on the continued presence of a particular individual and may be attributed to the individual owner's personal skill, training

or reputation." Finally, in Syllabus Point 4, the *May* Court held that:

In determining whether goodwill should be valued for purposes of equitable distribution, courts must look to the precise nature of that goodwill. Personal goodwill, which is intrinsically tied to the attributes and/or skills of an individual, is not subject to equitable distribution. On the other hand, enterprise goodwill, which is wholly attributable to the business itself, is subject to equitable distribution.

■ Upon a thorough review of the record and consideration of the relevant case law, this Court finds that the circuit court did not abuse its discretion in concluding that Hunter only has personal goodwill which is not subject to equitable distribution. In that regard, the circuit court concluded that the contractual provisions in the management agreements between NLP and Hunter amounted to insufficient evidence to establish that Hunter possesses enterprise goodwill. In particular, the circuit court found that the portion of the management agreement providing for a continuing income stream to Hunter in the event of Mr. Wilson's death was "nothing more than a method of payment to [Hunter] for Mr. Wilson's progress upon his death or incapacity." The circuit court also found that Hunter only has one employee—Mr. Wilson and that his personal services were the basis for the management agreements with NLP.

In this appeal, Ms. Wilson argues that Hunter has enterprise goodwill because it employs a highly skilled workforce and the circuit court erred when it concluded that Mr. Wilson is Hunter's only employee. According to Ms. Wilson, Hunter uses the skills of twenty to twenty-five highly compensated employees. Mr. Wilson, however, maintains that the aforementioned employees are not employees of Hunter, but are employees of NLP.

In support of her contention that Hunter has many employees, Ms. Wilson relies upon the testimony of her expert witness, Mr. Apple, which was also the basis for the family court's conclusion that Hunter has enterprise

goodwill. In reviewing Mr. Apple's entire testimony, however, the family court overstated Mr. Apple's reliance on this fact and its relation to enterprise goodwill. Mr. Apple stated specifically that he based his opinion on three elements, i.e., net present value of the future income stream as of the date of separation, cash on hand at the date of separation, and furnishings and fixtures.[15] This is first demonstrated in a response to a question regarding Mr. Apple's understanding of NLP, wherein Mr. Apple explained that it was his understanding that the employees in question were not employees of Hunter, but instead, employees of NLP and/or Inland Management, as he said:

Well, [Inland Management] appear[s] to have responsibility for some financing of projects, and National Land Partners, in conjunction with Inland Management. Quite frankly, I don't know what the difference is between those companies, but they employee [sic] all the people, apparently own all the land, moving equipment, whatever else would be required of the development company.

It was only later, during cross-examination by Mr. Wilson's counsel, that Mr. Apple made a brief comment regarding Hunter employees. Moreover, his comment was in conflict with his earlier testimony, was based solely upon Ms. Wilson's testimony the prior day, and it followed intense questioning from Mr. Wilson's counsel which attempted to demonstrate that Mr. Wilson did the vast majority of the work and that Hunter's success was primarily tied to his individual efforts.

Q. And would you agree with me that the Hunter Company of West Virginia and its success or failure, whether it's tied to the management agreement or operating independently outside of this management agreement its success or failures is largely tied to the effort of one person and that's Hunter Wilson?

A. I believe he's compensated for his efforts by Hunter Company of West Virginia. I believe that the value of

---

15. The furnishings and fixtures, totaling $51,660.00, and the Susquehanna bank accounts consisting of $401,803.00, were agreed upon and stipulated to by both parties prior to the hearing.

Hunter Company of West Virginia derives primarily from the management contracts and the projects that are underway.

Q. Well other than Mr. Wilson is the CEO of the company. Is there anyone else who's [sic] efforts either are the major part of the success or the failure of this company other than what he does?

A. I believe I heard testimony yesterday that there were 20 other highly compensated employees as well as the management agreement with very experienced National Land Partners.

This is the sole mention by Mr. Apple regarding Hunter's employees. It is clear that Mr. Apple did not rely significantly upon the number of employees of Hunter in determining the existence of enterprise goodwill. Nonetheless, Ms. Wilson's briefs before this Court focus heavily upon the number of employees of Hunter and how that proves the existence of enterprise goodwill. Specifically, she takes issue with the circuit court's finding that: "The evidence was not in dispute that this 'workforce' is composed entirely of employees of Inland Management Co., an NLP subsidiary. [Hunter] has only one employee, Mr. Wilson, and if he left [Hunter], it would collapse entirely."

While Ms. Wilson is correct in her assertion there was a dispute regarding the number of employees employed by Hunter, the evidence in the record supports the circuit court's conclusion that Hunter has only one employee—Mr. Wilson.[16] In that regard, the evidence presented below showed that Hunter did not produce or provide a single check to any "employee," other than Mr. Wilson himself. Inland Management, of which Hunter has absolutely no equity interest, paid all invoices that were sent to them, they cut the checks, they handled the profit and loss statements, and paid bills attached to vouchers. Inland Management even provided health and retirement benefits to the employees, all of which were a part of the project expenses, of which NLP exclusively paid. Moreover, the Management Agreement provides that Hunter is "[t]o arrange for the employment from time to time, on such terms and for such compensation *as may be mutually agreed* by [NLP] and [Hunter]." (Emphasis added). As such, Hunter is not free to hire anyone to be a part of any of the projects, nor can it independently set their salaries, without the express permission of NLP. As stated, Hunter was an independent contractor for NLP and Inland Management was a subsidiary of NLP. Even NLP's chief financial officer, Mr. Murray, stated that the employees of the projects in question were employees of NLP. He explained:

... we have everyone be an employee of Inland Management, and then the individual operating companies in the different states utilize the Inland employees to get their work done. Anyone who works on a

16. During the January 7, 2008, hearing before the family court, when asked: "And how many employees or personnel are actually involved in the Hunter Company of West Virginia?", Mr. Wilson replied, "One." There was no dispute regarding the number of Hunter employees at that hearing. In her argument before this Court, Ms. Wilson attempts to provide a "gotcha" moment citing Mr. Wilson's testimony at the May 8, 2008, hearing before the family court, wherein her counsel asked Mr. Wilson questions such as "What does your most highly compensated sales manager make?" It is Ms. Wilson's argument that because Mr. Wilson answered this and similar questions, that it amounted to an admission that Hunter had in excess of twenty employees. A thorough reading of the record, however, reveals that Mr. Wilson was simply responding to questions about individuals of whom he supervises and hires for the various projects, and who are paid by Inland Management, a wholly owned subsidiary of NLP. During cross examination, Mr. Wilson explained and clarified that the people who work at the business offices of Hunter are not employees of Hunter.

Q. You told us this morning that there were some twenty employees that work at the business offices of Hunter Company of West Virginia?

A. Yes, Sir.

Q. Who pays those employees?

A. They're employees of Inland Management. That's where their pay comes from?

Q. So, you do not pay any of the some twenty people that work at the business offices of Hunter Company of West Virginia?

A. No, Sir.

Q. How many employees does Hunter Company of West Virginia have?

A. One.

Q. Who's that?

A. Me.

project here in West Virginia, even though they're under Mr. Wilson's supervision, their paycheck is going to come from Inland Management. That way, we can give them a 401(K) that will be there indefinitely, health insurance, the typical employee benefits.

As Mr. Murray further explained with regard to NLP,

At the back office level which is based in Williamstown, Massachusetts, we pay all the bills once a week, we write the payroll checks, we take care of all of the accounting, we take care of all the marketing, we place classified ads, TV commercials, radio commercials, anything that's needed to market the project. We develop that in Massachusetts and take care of the ... the placement. We perform financial statement preparation each month, tax return preparation each year, all of the things that aren't necessarily needing to be done locally.

In consideration of all of the above, the circuit court did not error in finding that employees were not employees of Hunter.

Ms. Wilson also argues that Hunter possesses enterprise goodwill based upon a future income stream to Hunter in the event of Mr. Wilson's death or incapacitation. Ms. Wilson' argument is based upon the provision in the management agreement with Hunter and NLP which states:

In the event of the death or incapacitation of L. Hunter Wilson, [NLP] will hire a substitute person or entity to manage the project. In the event a substitute is hired, manager shall be entitled to its compensation as determined in Section 6 using Generally Accepted Accounting Principles consistently applied, however, the cost of such substitute manager shall be an expense of the project.

The "compensation" defined in Section 5 of the Management Agreement refers to the "net profits" formula for paying the manager for its services rendered. As previously noted, the circuit court determined that such provision merely provided a method for payment to Hunter for Mr. Wilson's work in progress in the event of his death or incapacitation.

Contrary to Ms. Wilson's assertions, the evidence of record overwhelmingly supports a conclusion that Hunter only has personal goodwill. For example, it is undisputed that Mr. Wilson had a long relationship with the principals of NLP going back to the 1980s. Moreover, Mr. Murray explained that Mr. Wilson's association with NLP was based upon "a long record of performance in projects that Harry Patt[e]n [President of NLP] has been associated with, and when we formed National Land Partners, [Mr. Wilson] was the logical person to manage our projects."

Mr. Murray described the Management Agreement between NLP and Hunter as a service-generated contract. He explained that it was critically important to have Mr. Wilson working on the project. He said, "Without Hunter Wilson, we really don't have a project locally...." During another part of his testimony, Mr. Murray stated, "The company itself does nothing unless Hunter Wilson does it, so the ... the real strength of the manager agreement is, in this case, Hunter Wilson who signs as the principal." Mr. Murray further said, "I'm not sure there's another person in the State of West Virginia that has the skill sets that are required to manage our business."

Mr. Murray explained that attempting to replace Mr. Wilson upon his death or incapacitation would not only be difficult, but also costly to the project and the final net profits. Those costs, he explained, would be highly speculative given the necessity of finding a substitute manager with appropriate qualifications.

Q. If Mr. Wilson would die or become incapacitated under the ... the terms of these management agreements, what would ... what would the costs be to hire a substitute manager to replace him with? Would it be a salary basis, or how would that happen?

A. In our experience, we are unable to find people with all of his qualifications that we can hire for a salary. Those people are very accustomed to making large amounts of money, more than a salary would be worth, and

they're ... they are accustomed to getting a share of the profits. So, in our experience, we would end up paying some other replacement manager some percentage of profits, and it would be whatever we could negotiate.

During cross-examination by Ms. Wilson's counsel regarding why it would be difficult to hire a replacement manager for Mr. Wilson in spite of his high base salary, Mr. Murray explained that finding a suitable replacement was not just an issue of salary.

Q. So, the basis of your conclusion that it would be difficult to find someone to manage this product for $300,000 a year is what again, sir?

A. It's not the amount you pay. It's the person that you find. There ... it is a very unique job that he performs, and there are not a lot of people out there that can do it well. There are a lot of people in the world who would argue to you that they can perform that job, but we have a long list of people who have come and gone in our organization who proved they couldn't."

As the circuit court pointed out, Mr. Wilson was an independent contractor for NLP. He did not have client lists, nor did he have patient files similar to a doctor's office. He was restricted and bound by the Management Agreement. Moreover, the Management Agreement explained that he could not assign his interest in that Agreement, making his interest lack any marketability. Likewise, any attempt to place a value for future work on any new projects, other than the existing projects under construction, would be extremely speculative as the Management Agreement specifically provides that "[NLP] is not required to offer future projects to [Hunter]." It further states, "[t]his Agreement shall not obligate [NLP] to offer any future projects to [Hunter], nor shall [Hunter] be entitled to benefits from or participation in any project other than the Projects and Scheduled Properties described herein...." Moreover, as the Management Agreement states, "[Hunter] shall have no ownership interest in or right to [NLP], Projects, or any Scheduled Property...." Furthermore, the Agreement makes clear that:

"The parties acknowledge that the services and performances to be rendered hereunder are unique and personal. Accordingly, neither party may assign nor delegate any of its duties or obligations under this Agreement."

This Court has also considered Ms. Wilson's argument that Hunter has enterprise value based upon the product names associated with Hunter for the various construction projects under construction, the amounts spent on advertising those projects, and her contention that Hunter has seven business locations. With regard to the business locations, the circuit court found that the evidence of record supports the conclusion that Hunter only owns one business location. The remaining properties are owned in the entirety by an NLP subsidiary and the only association that Hunter has with those locations is in utilizing them in the management of each particular project. Moreover, upon completion of a project, Hunter's use of that particular business location ceases to exist. With regard to the advertising campaigns for the various projects, the circuit court correctly found that it is undisputed in the record that such advertising and promotional expenses are costs of the project paid exclusively by NLP and not Hunter. While Ms. Wilson claims that she may have helped design some of the ads, Mr. Murray explained, "[NLP] take[s] care of all the marketing [at NLP's home office in Massachusetts], we place classified ads, TV commercials, radio commercials, anything that's needed to market the project. We develop that in Massachusetts and take care of the ... the placement." Likewise, none of the advertising campaigns actually advertised Hunter. Instead, as the circuit court explained, they advertised particular projects such as The Point or Ashton Woods. Based upon these facts, Ms. Wilson's argument that the circuit court erred is without merit.

In consideration of all of the above, it is clear that any goodwill attributable to Hunter is exclusively personal goodwill. There can be little argument against the fact that the future success or failure of Hunter is intrinsically tied to Mr. Wilson's reputation, knowledge, and skills, and thus, is not subject to equitable jurisdiction. Accordingly,

the circuit court's order is affirmed to the extent that it finds that Hunter has only personal goodwill.

## B. Manager Fees

■ Separate and apart from the issue of goodwill is the determination of the value of the manager fees, i.e., the profits from the six projects that were being managed by Hunter at the time the parties separated. In its order, the circuit court adopted the "construction spending theory" advanced by Mr. Wilson to determine the value of the manager fees on the projects.[17] Accordingly, the circuit court concluded that Hunter's manager fees had a negative value of $(2,680,672.00) as of the date of separation due to construction costs and premature payments and overpayments of manager fees by NLP,[18] and that Ms. Wilson was also responsible for half of that debt. The circuit court thereafter found that Ms. Wilson's prior advance payment toward equitable distribution in the amount of $4,337,438.00 resulted in an overpayment to her in the amount of $894,286.00. Therefore, she was ordered to pay that amount to Mr. Wilson in thirty days with interest. The circuit court then remanded the case to the family court to establish a value to the manager fees attributed to the remaining two projects based solely upon the percentage of construction spending for each project at the time of the parties' separation. Upon a thorough review of the record and consideration of the relevant case law, this Court finds that the construction spending theory is fatally flawed.

The construction spending theory looks at construction spending as of the date of separation on each project and uses that figure alone to determine what work Hunter had done as of that period of time. As Mr. Wilson's counsel argued during the May 9, 2008, hearing, "The work that has been done and the percentage of that work as it relates to the project gives us, in our argument, ... a percentage that is a ... that is a marital share of the total." As his counsel further explained, his construction theory was critical to view "the percentage of construction spending as of the time of separation based upon the total spending, and those percentages are important to determine, in our view, the marital share of the total manager fees earned on projects that were pending and ongoing at the time of separation." By its very nature, such a theory is always going to show substantial debt during the infancy of a project between Hunter and NLP. This is backed by the testimony of Mr. Wilson and Mr. Murray, discussed herein, regarding their explanations of how a project is completed from beginning to end including various costs, payments, obligations, and finally, the realization of profits, oftentimes many years after a project begins.

A major flaw with the construction spending theory, as applied to the specific circumstances of the Management Agreement in this case, is its basic disregard for the recognition that net profits are not paid to Hunter until completion of a particular project. As such, the receipt of those profits necessarily reflects efforts by Hunter that occurred from

17. An exhaustive search by this Court of federal and state cases from throughout the entire country failed to locate a single case that referenced a "construction spending theory."

18. On June 1, 2005, Ms. Wilson filed a motion for an expedited hearing to preserve the marital estate stating that Mr. Wilson had transferred "in excess of Two Million Dollars to accounts of [Hunter]." There was testimony regarding Mr. Wilson paying money to NLP for overpayments even though the final net profits for that particular project had not been paid to Hunter. The argument was grounded in the principle that any attempt to liquidate, sell or transfer marital assets without the permission of all parties constitutes fraud if such transfer is made in an attempt to avoid equitable distribution. W.Va.Code § 48–7–108 provides, in pertinent part:

A husband or wife may alienate property at any time prior to the entry of an order under the provisions of this article or prior to the recordation of a notice of lis pendens in accordance with the provisions of part 7–401, et seq. [§§ 48–7–401 through 48–7–402], and at anytime and in any manner not otherwise prohibited by an order under this chapter, in like manner and with like effect as if this article and the doctrine of equitable distribution had not been adopted: Provided, That as to any transfer prior to the entry of an order under the provisions of this article, a transfer other than to a bona fide purchaser for value shall be voidable if the court finds such transfer to have been effected to avoid the application of the provisions of this article or to otherwise be a fraudulent conveyance.

the very inception of a project, and throughout each and every phase thereafter, until a project's completion. Said another way, NLP invests millions of dollars during the infancy of a project, with the expectation of reaping the rewards of potentially tens of millions of dollars in returns that will not be realized for several years later. At that time, Hunter also receives his manager fees.

It is important to note that the money used to finance every aspect of each of the projects in this case was provided entirely by NLP and not Hunter. As such, even though Hunter does not have to set aside any money for the construction costs, payment of employees, payment for marketing costs, or any costs associated with a project's expenses, the circuit court nonetheless allocated a value to be charged against Ms. Wilson based upon NLP's money expended at a particular point in the project. Determining manager fees for a project utilizing the construction spending theory during the early period of a project, especially when the money and risk at that moment was NLP's money and not Hunter's, is entirely unreasonable given the nature of the agreement between Hunter and NLP.

It has been established that Hunter does not get paid until NLP gets its twelve-and-one-half percent and that Hunter's eventual profits are even dependent upon factors such as the sale of timber on the land associated with a particular project. Likewise, as previously stated, Hunter does not get paid until after all of the costs associated with the project are paid including, but not limited to: the acquisition of property; development of the roads; installation of utilities; subdivision design and development; legal expenses; sales; marketing; general administration costs; interest expenses on bank loans which are necessarily higher at the beginning of a project; engineering costs; installation of signage; soil testing, contingency accounts and other unforeseen problems; fuel costs; material costs; project overruns; payment of NLP's tax liability associated with a particu-

lar project; and any other expenses related to the project. It is only then, when all expenses have been paid in full, that Hunter receives any payment of net profits under the Management Agreement.[19] In his "Bench Brief of Respondent Leon Hunter Wilson" filed on May 7, 2008, which was the same date as one of the underlying hearings before the circuit court, Mr. Wilson, through counsel, explains:

> Thus, Hunter Co. does not receive any compensation for its services *until a project or scheduled property is completed.* This is called a "management fee" and consists of the net profits, if any, of a project or scheduled property as defined in the Management Agreements. If there are no net profits, Hunter Co. must absorb the losses of a project, as set out in the Management Agreements.

(Emphasis added). Mr. Wilson's counsel further explains,

> The development and resale of a property can take many months or years, depending upon the size of the project, market factors, and other intangibles. Hence, there are development projects that were begun by Hunter Co., prior to the parties' separation, *that have not matured or been fully realized at this date since the net profits, if any, are contingent upon the sale of the developed lots, completion of construction, or other factors.*

(Emphasis added). Likewise, Mr. Murray explained that a manager's management fee is paid "at the completion of a project which we define as all lots being sold, all debt being paid, all construction being completed, all bonds being returned. . . ."

Mr. Apple further discussed the front-loading of expenses in relation to the construction spending theory as follows:

> Well the concept there would be if you were on the cash basis of accounting, which is what most of us understand, it's income when I got the money in my hand. It's an expense when I pay it out. Okay.

---

19. While it is correct that the Management Agreement states that NLP can distribute manager fees based upon mutual assent of NLP and Hunter, it is equally clear that such profits are generally distributed at the completion of a pro-

ject. In fact, Mr. Wilson and Mr. Murray stated repeatedly throughout the myriad filings and hearings before the family court and circuit court that compensation is not paid to Hunter until a project is completed and all other costs are paid.

But cash-basis accounting is not generally accepted accounting principles. Generally accepted accounting principles require that you match the expenses to the recognition of the income. So when you're talking about a development, a real estate development company like we have here, for instance if you haven't sold any lots yet but you've spent a million dollars building roads and putting in utilities, on a cash basis your financial statement would say I have zero income and a million dollars in expenses. I lost a million dollars. That would be on the cash basis. Under general accepted accounting principles, none of those costs would be expensed until a lot was sold.

Mr. Murray also described the risk of land development business as "enormous" during the early stages of a project.[20] He explained that it is an extremely capital intensive business which starts with putting capital at risk before you even own a piece of property. He stated: "It is not unusual for us to spend $50,000 to $100,000 getting a property surveyed, getting property soil tested, preparing drainage, engineering preliminary drawings to determine whether it's even feasible to own it." He added:

If we purchase the property we then have to pay the purchase price, in cash most of the time. Occasionally we find a seller who's willing to finance it, but that's rare. So, you now have spent money to determine if you want to own it. You then spend money to own it, and then you begin spending money to develop it so that you wait, sometimes, years before you see a profit.

The value of the Management Agreement to Hunter necessarily fluctuates year by year due to the nature of this type of work and such fluctuations can be drastic.[21] Moreover, it was agreed by the parties that the most accurate value of a project could be determined at the completion of a project. This is also reflected by Ms. Wilson's testimony during the May 8, 2008, hearing regarding her 2004 tax returns which showed significant income resulting in net profits of nearly $12 million to Hunter. She explained that the large payment that year resulted from an "accumulation of work for the previous, lets's say, year and a half, two years." It is safe to assume that had a court utilized the construction spending theory in considering that project during its infancy, that Ms. Wilson would not have received any of those profits regardless of any efforts from Hunter prior to payment of the net profits.[22]

As discussed, instead of identifying the amount of work that Hunter did as of the

---

20. As Mr. Murray stated, the real estate business is a "risky business." Evidence of record indicated that problems with asphalt on one project could potentially lead to significant additional expenses, while additional costs were incurred on another project due to storms. Mr. Wilson also pointed to the possibility of Hunter losing money due to a civil lawsuit filed pertaining to a project completed several years prior to the parties' separation. With regard to the storm damage, Mr. Wilson testified that on one occasion heavy storms caused "wash outs" which led to approximately $30,000.00 in damages.

21. This is evidenced by the parties income taxes during a three year period from 2004–2006, wherein, based upon Hunter's profits, the parties made approximately $12 million, $5 million, and $1.8 million, respectively.

22. Ms. Wilson also argues that the circuit court erred by relying upon certain documents that were admitted into evidence by the family court over her counsel's objection for lack of authentication. She contends that these documents were the basis for the circuit court's adoption of Mr. Wilson's construction spending theory to de-termine the value of the manager fees. Given our final disposition of this case, which includes remanding it to the family court for further proceedings relating to the value of Hunter's manager fees, it is not necessary to address the admission of the documents. Nonetheless, after reviewing the evidence of record and the transcript of the May 9, 2008, hearing, it is clear that the principal argument below was not based on the ability to authenticate documents as is argued in Ms. Wilson's brief herein. In fact, these were the same types of documents relied on by Ms. Wilson's expert in preparing his opinion. Instead, the primary argument was regarding the alleged lateness of providing the information to Ms. Wilson's counsel. Mr. Wilson's counsel maintained that many of the documents were already admitted, while others they had just received from NLP and immediately delivered them to Ms. Wilson. The circuit court listened to arguments on this issue for a considerable period of time (nearly thirty pages of the transcript) and ultimately admitted the evidence over Ms. Wilson's objection.

time of separation, and thereafter calculating to what extent that work was directly attributable to the final net profits received by Hunter on each individual project, Mr. Wilson's construction spending theory completely ignored the net profits paid at the completion of a project. Such a theory is only valid if the work done by Hunter in preparation for the sale of the lots had absolutely no value or nexus whatsoever to those later sales and/or profits. The very nature of this type of an agreement between Hunter and NLP is that significant amounts of time and effort are invested in the beginning that will, more often than not, result in substantial profits at the completion of a project. The construction spending theory ignores and attaches no value whatsoever to Hunter's efforts prior to the separation of the parties, and ignores the future payments of profits based, in part, upon those early efforts. Such a result is not equitable, and thus, is simply not reasonable. The circuit court's adoption of the construction spending theory was error and must be reversed.

### C. There Is a Value to the Manager Fees Separate and Distinct from a Determination of Goodwill.

Having determined that the circuit court erred in its adoption of the construction spending theory, this case must be remanded for a determination of the value of the manager fees on the projects that existed at the date of separation. It seems that the parties, as well as the lower courts, relied heavily on a discussion of personal versus enterprise goodwill, while ignoring altogether the fact that a separate value attached to the manager fees. For example, both in her brief before this Court as well as throughout the opinion testimony of Mr. Apple, Ms. Wilson seems not to comprehend that a value of goodwill is a potential value that is additional and separate from any actual value that can be attributed to Hunter's manager fees based upon its efforts prior to the parties' separation. In demonstrating the confusion surrounding this concept, Ms. Wilson's counsel even went so far as to argue in her brief before this Court that the

remand by the circuit court clarifies the extent to which the circuit court did not

understand *May* or even the implications of its own findings on reversal. If the Hunter Company did not possess enterprise goodwill its value was related only to its physical assets such as furniture and computers, and its cash on hand, as of the date of separation. There was never a dispute regarding the value of the physical assets and the cash on hand as of the date of separation. Retaining jurisdiction would only be appropriate if the Hunter Company possessed "enterprise goodwill" based upon the net profits to be paid in the future pursuant to the Management Agreement.

Likewise, Mr. Wilson's counsel seems not to recognize the possibility that any future profits paid after the date of separation could actually relate back to the pre-separation efforts of Hunter separate from a finding of enterprise goodwill. This is reflected in Mr. Wilson's counsel's question to Ms. Wilson that: "And today you're asking the Court to award the sweat-income from Mr. Wilson's sweat equity after 2005?" Following an objection by Ms. Wilson's counsel, Mr. Wilson's counsel continued: "But Your Honor, the testimony is she did nothing in the business after 2005, she just admitted that, obviously it came from his work, so if she's asking for income after that date, she would have to be asking for exactly what I asked her."

Hunter was a business that the parties started together and carried on together for nearly thirteen years prior to Ms. Wilson's filing for divorce. Throughout those years, Ms. Wilson claims to have sold land, arranged closings, run the office, and inspected land with Mr. Wilson. She further claims that as the business grew, she hired and managed the secretarial staff, trained them, and taught them the office procedures. In addition to her efforts directly related to Hunter, Ms. Wilson states that she spent a lot of time managing the parties' personal affairs such as their 250 acre horse farm. She said this allowed Mr. Wilson to spend more time with Hunter.

As discussed *ad nauseam* herein, by the date of separation, Hunter had already invested a significant amount of time and preparation to which it is reasonable to assume

some value is directly attributable to the final net profits of the projects in existence at the time of the parties' separation. Said another way, Hunter's efforts prior to the parties' separation led to significant profits totaling millions of dollars paid at the completion of the various projects. Given the specific facts of this case, this does not involve enterprise goodwill nor personal goodwill. Instead, it is a value placed on the actual services rendered by Hunter of which payments were delayed until the completion of the project as prescribed by the Management Agreement. While there are distinct differences, it is the type of arrangement that shares some similarity to a contingency fee arrangement between an attorney and client. In fact, Mr. Wilson argues in his brief to this Court:

> Similar to a contingent fee contract entered into by an attorney before his/her separation, these development projects may be marital property or have a marital property component. However, their respective values will not be realized, and thus cannot be determined until the projects are completed under the Management Agreements. As such, this Court should retain and continue jurisdiction as to those development projects which are in whole or in part marital property, until the value of the net profits or losses can be properly determined and the value of the marital component ascertained.

In *Graham v. Graham,* 195 W.Va. 343, 345–346, 465 S.E.2d 614, 616–617 (1995), this Court explained:

> Moreover, in a number of cases we have indicated that the existence of an ascertainable present value is not the key determinant of whether the interest should be considered marital property. Instead, we have stated that, given the broad legislative definition of marital property, several types of expectancies, or near expectancies, with little or no present value, are marital property for equitable distribution purposes. For example, a contingent fee contract entered into by an attorney during marriage was held to be marital property under W.Va.Code, 48–2–1(e)(1). *Metzner v. Metzner,* 191 W.Va. 378, 446 S.E.2d 165 (1994). Somewhat similarly, in

*Hardy v. Hardy,* 186 W.Va. 496, 413 S.E.2d 151 (1991), we held that the economic losses attributable to a personal injury claim during marriage were "property" for marital distribution purposes. Lastly, and more significantly, in *Smith v. Smith,* 190 W.Va. 402, 438 S.E.2d 582 (1993), and a number of prior cases, we have held that pension benefits were "property" for marital distribution purposes. *See also, Langdon v. Langdon,* 182 W.Va. 714, 391 S.E.2d 627 (1990); and *Cross v. Cross,* 178 W.Va. 563, 363 S.E.2d 449 (1987).

In Syllabus Point 3 of *Metzner v. Metzner,* 191 W.Va. 378, 446 S.E.2d 165 (1994), this Court explained, "[w]hen a contingent fee contract is acquired during marriage, it is 'marital property' within the meaning contemplated by West Virginia Code § 48–2–1(e)(1)." Moreover, "[i]n the event that post-separation work on a case in which a contingency fee award is ultimately obtained can be identified, such work must be accounted for and any monies attributable to such work should be treated as separate property within the meaning of West Virginia Code § 48–2–1(f) (1992)." Syllabus Point 4, *White v. Williamson,* 192 W.Va. 683, 453 S.E.2d 666 (1994). In addition, "[c]ontingent and other future earned fees which an attorney might receive as compensation for cases pending at the time of a divorce should be treated as marital property for purposes of equitable distribution. However, only that portion of the fee that represents compensation for work done during the marriage is actually "marital property" as defined by our statute. Because the ultimate value of a contingent fee case remains uncertain until the case is resolved, a court must retain continuing jurisdiction over the matter in order to determine how to effectuate an equitable distribution of this property." Syllabus Point 5, *Metzner.*

 Mr. Wilson specifically stated during the January 7, 2008, hearing that Ms. Wilson was entitled to half of the efforts of Hunter up to the date of separation. Mr. Wilson even acknowledged during his testimony that the Management Agreement itself had value. This is not in dispute. Mr. Wilson then said, and we agree, that his efforts

after the date of separation are not subject to equitable distribution. Mr. Wilson further opined that the value of Hunter was its net profits, cash on hand, minimal furnishings, and any sums due to it from NLP based upon the Management Agreement. To this end, the Management Agreement is the exclusive methodology to earn money for Hunter. Accordingly, we now hold that profits of a business that are based upon a future contingency or obligation are subject to equitable distribution upon the dissolution of a marriage, but only that portion of the profits for work done during the marriage is actually "marital property." In determining the amount of profits subject to equitable distribution, sound valuation methods must be used, and it may be necessary for a court to retain continuing jurisdiction over the matter until such profits are determined in order to effectuate an equitable distribution of this property.

■ In this case, Ms. Wilson, as co-owner of Hunter, was entitled to half of the manager fees for the work that was completed on the existing projects at the date of separation. Having found that the circuit court erred in its adoption of the construction spending theory, this case must be remanded to the family court to determine the value of those manager fees.[23] Upon remand, and in light of the inadequacies of the evidence contained in the record below, the family court shall hold a new hearing for the purpose of allowing both parties to present new evidence, consistent with this opinion, with regard to the value of the manager fees.

■ While Ms. Wilson contends that the manager fees should be determined based upon the testimony of her expert, Mr. Apple, a review of that evidence reveals glaring problems that ultimately make his opinions and projections unreliable in their entirety with regard to an accurate determination of the actual value of Hunter at the time of the parties' separation. Mr. Apple explained during the May 9, 2008, hearing, that he based his valuation upon the individual pro-

---

**23.** Ms. Wilson maintains that the circuit court abused its discretion when it remanded the case to the family court to determine the actual profits for two of the six real estate projects in spite of the fact that the parties agreed that the date of separation was May 31, 2005, for purposes of the valuing the marital estate. She contends that the remand highlights the circuit court's misunderstanding of *May, supra,* in that, "if Hunter does not possess enterprise goodwill, as the circuit court found, then ... retaining jurisdiction is only appropriate if Hunter possesses enterprise goodwill based upon net profits to be paid in the future pursuant to the Management Agreement."

Conversely, Mr. Wilson states that the construction spending theory adopted by the circuit court allows for the determination of actual profits earned both before and after the date of separation. As such, he contends that the case was properly remanded to the family court to accurately distribute the marital estate. He points out that W.Va.Code § 48-7-104(1) requires continuing jurisdiction since all marital manager fees cannot yet be determined. W.Va. Code § 48-7-104(1), in part, provides:

After considering the factors set forth in section 7-103, the court shall:

(1) Determine the net value of all marital property of the parties as of the date of the separation of the parties or as of such later date determined by the court to be more appropriate for attaining an equitable result. Where the value of the marital property portion of a spouse's entitlement to future payments can be determined at the time of entering a final order in a domestic relations action, the court may include it in reckoning the worth of the marital property assigned to each spouse. In the absence of an agreement between the parties, when the value of the future payments is not known at the time of entering a final order in a domestic relations action, if their receipt is contingent on future events or not reasonably assured, or if for other reasons it is not equitable under the circumstances to include their value in the property assigned at the time of dissolution, the court may decline to do so; and

(A) Fix the spouses' respective shares in such future payments if and when received; or

(B) If it is not possible and practical to fix their share at the time of entering a final order in a domestic relations action, reserve jurisdiction to make an appropriate order at the earliest practical date;

If a valuation is made after a contingent or other future fee has been earned through the personal services or skills of a spouse, the portion that is marital property shall be in the same proportion to the total fee that the personal services or skills expended before the separation of the parties bears to the total personal skills or services expended. The provisions of this subdivision apply to pending cases when the issues of contingent fees or future earned fees have not been finally adjudicated.

This issue has been resolved by this Court's reversal, in part, and remand of this case to the family court.

ject projections that were provided to him by Mr. Wilson. He also said that due to the way the documents were prepared, that it was impossible to separate projections from actual figures. Importantly, Mr. Apple declared that his valuation of Hunter for purposes of determining a value of future profits at the time of the parties' separation was limited to a review of only three projects, i.e., The Springs, WestVaco, and WestVaco Greenbriar, which is also known as Overlook at Greenbriar. In response to the questions from Mr. Wilson's counsel, Mr. Apple testified as follows:

Q. ... It's my understanding you looked at three projects. Were you aware that there were other projects that were also at some stage of construction or completion at the time of separation?

A. No. It's my understanding these were the only three that were incomplete at the date of separation.

Q. So you did not look at any documents or financial statements that relate to a subdivision known as [The] Point.

A. I have copies of some of those known as [The] Point. Yes.

Q. You have the documents, but you didn't use them in your analysis?

A. Correct.

Q. And were you aware that there were engineering expenses, and work was being done on that project at the time of separation?

A. No.

Mr. Apple was then questioned regarding another active project of Hunter known as Ashton Woods.

Q. There is also a project known as Ashton Woods. Were you provided documents about Ashton Woods?

A. I have seen documents on Ashton Woods. Yes.

Q. And so your analysis does not address the manager fees that were receivable or urged and any expenses that may have been charged against those manager fees?

A. No. It was my understanding that both of those projects manager fees had been paid prior to separation.

Q. Okay. And who gave you that information?

A. Don't know if I determined that from the documents or whether [Ms. Wilson] told me that. It could have been either one or both.

Q. Okay. So if, if there is evidence that these projects were ongoing; there were manager fees, either payable or receivable at the time of separation and after separation, would you agree that your report is incomplete?

A. Yes.

When Mr. Apple was questioned further regarding the three projects he actually did review, he explained that his projections were based upon information that was dated as of October 2007, and that those projects were not completed at that time. In response to questions by Mr. Wilson's counsel, Mr. Apple agreed that if he had used actual numbers of closed projects as a part of his valuation, where there was a final determination of the amount of manager fees that had actually been earned, versus projections of what that number would be, that the actual numbers would have been more accurate. When questioned further regarding his projections for the project known as The Springs, he admitted that he did not know anything regarding whether or not the roads were finished or whether or not the infrastructure was completed. He also stated that he did not know any information as to what stage of completion that project was at the time of his valuation. Moreover, in providing a value on The Springs project, he based his opinion upon projected sales of lots with little to no consideration given to future project debts or payments to NLP even though he recognized during his testimony that "no net profits are paid until the debts are paid off." Mr. Apple agreed that his opinions "are projections and are not based on the actual final numbers on any of these projects." Mr. Wilson's counsel then asked Mr. Apple:

Q. I guess just to make sure we're all on the same page, are you aware that the

final information on these projects that have been closed was provided to Ms. Wilson's attorneys, you just haven't analyzed it; is that right?

A. I don't know.

It is clear that Mr. Apple's opinion failed to consider at least three projects that were active at the time of the parties' separation. Moreover, with regard to the projects that he actually did review, Mr. Apple admitted that a better source for valuation would have been the consideration of the final information on those projects at the time of their completion. Furthermore, evidence was admitted showing that much of the information, which was not considered for his expert opinion, was in Mr. Apple's possession and/or in the possession of Ms. Wilson's counsel prior to his testimony. Moreover, it was agreed upon at a March 20, 2006, hearing, more than two years prior to Mr. Apple's May 9, 2008, testimony, that Mr. Apple was permitted to have direct contact with Mr. Wilson at any point to expedite the delivery of any documents that he needed to prepare his opinion regarding the value of Hunter's manager fees at the time of the parties' separation.[24] Mr. Apple's opinion further failed to take into consideration numerous future costs of the various projects that he did review, which necessarily resulted in inaccurate and inflated projected net profits.[25] He also failed to consider in his opinion a value of Hunter's manager fees separate and distinct from any goodwill at the time of the parties' separation.[26]

Based upon the record below, which includes Mr. Apple's complete testimony before the family court, it is clear that without reviewing all of the projects in process at the time of separation, it is impossible to render an accurate and reliable opinion within a reasonable degree of accounting certainly with regard to the value of Hunter's manager fees at the time the parties separated. Moreover, with regard to the number of projects, the record below demonstrates there has consistently been, and appears to still be, significant confusion among the family court, the circuit court, both parties, and the numerous witnesses regarding even the actual number of active projects which had begun prior to the parties' separation. This is of particular import given the fact that the value of the manager fees can only be determined by considering the work done for each project at the date of separation.

 An example of the confusion, with regard to the number of projects, can be

---

24. Mr. Wilson's counsel maintained in correspondence to the family court, which is included in the record, that Mr. Apple did not contact Mr. Wilson at any time.

25. In spite of the fact Mr. Apple relied upon lot sales in forming his projections, giving little consideration to future project expenses, he admitted during testimony that he was aware of the fact that real estate development projects, such as the ones between Hunter and NLP, were uncertain and included significant risk. He also agreed that at the time of his testimony that the real estate market was in a slump and that a lot of inventory remained unsold. He further recognized that financial problems associated with the embattled economy at that time also effected the marketplace. Nonetheless, these factors were not considered in his ultimate valuation of Hunter.

26. Ms. Wilson argues that due to Mr. Apple's "unrebutted expert testimony," that the circuit court was precluded from reversing the family court. This Court has held that: " 'A measure of discretion is accorded to a family [judge] in making value determinations after hearing expert testimony. However, the family [judge] is not free to reject competent expert testimony which has not been rebutted. This statement is analogous to the rule that "[w]hen the finding of a trial court in a case tried by it in lieu of a jury, is against the preponderance of the evidence, or is plainly wrong, such finding will be reversed and set aside by this Court upon appellate review." Syllabus Point 1, in part, *George v. Godby*, 174 W.Va. 313, 325 S.E.2d 102 (1984), quoting Syllabus Point 4, *Smith v. Godby*, 154 W.Va. 190, 174 S.E.2d 165 (1970).' Syl. Pt. 1, *Bettinger v. Bettinger*, 183 W.Va. 528, 396 S.E.2d 709 (1990)." Syllabus Point 4, *Helfer v. Helfer*, 224 W.Va. 413, 686 S.E.2d 64 (2009). Nonetheless, this Court has further explained, " '[t]he testimony of expert witnesses on an issue is not exclusive and does not necessarily destroy the force or credibility of other testimony. The jury has a right to weigh the testimony of all witnesses, experts and otherwise; and the same rule applies as to weight and credibility of such testimony.' Syllabus Point 2, *Webb v. Chesapeake & O. Ry. Co.*, 105 W.Va. 555, 144 S.E. 100, cert. denied, 278 U.S. 646, 49 S.Ct. 82, 73 L.Ed. 559 (1928)." Syllabus Point 6, *Frye v. Kanawha Stone Co., Inc.*, 202 W.Va. 467, 505 S.E.2d 206 (1998).

found in a May 12, 2008, "Joint Trial Order," wherein the family court states: "The parties agree there were four (4) said projects as of the date of separation, being Overlook at Greenbriar, The Springs a[t] Shepherdstown, West Vaco I and The Point. Petitioner alleges there may be another West Vaco project." That same language citing the agreement that there were four projects is also included in the family court's May 8, 2008, pretrial order. Neither order referenced two other projects known as Ashton Woods and Crossings on the Potomac. Next, during his opening statement at the May 8, 2008, hearing, Mr. Wilson's counsel states: "So there will be testimony about these various construction projects and to be more specific, Your Honor, there were five projects that were in existence and were in some stage of development at the time the parties separated." Mr. Wilson's counsel then listed those five projects as: Ashton Woods, Crossings on the Potomac, WestVaco, Springs at Shepherdstown, and Overlook at Greenbriar. Mr. Wilson's counsel did not mention the project known as The Point. Then, within the family court's November 21, 2008, final divorce order, the family judge references five projects. Nonetheless, without any discussion or explanation, the circuit court, through its March 25, 2009, final order, states as fact numerous times that there were six pending projects at the time of separation. Then, on three occasions during the body of the circuit court's order, wherein the family court's order was reversed, the circuit court stated emphatically that at the time of the parties' separation, Hunter was involved in the management of six real estate projects and listed them as: Ashton Woods, Crossings, Overlook at Greenbriar, The Springs at Shepherdstown,

WestVaco, and The Point. Finally, in their briefs before this Court, both parties maintain that there were six projects in existence at the time of the parties' separation. It is difficult to understand how so many individuals could have failed to reconcile this problem given the fact that this case has been ongoing for more than five years[27] since the parties' May 31, 2005, separation.[28]

 This Court has explained that: "Equitable distribution … is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets. The third step is to divide the marital estate between the parties in accordance with the principles contained in [former] W.Va. Code, 48–2–32 [now W.Va.Code § 48–7–103]." Syllabus Point 1, in part, *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990). Unfortunately, as discussed herein, the parties submitted little credible evidence as to the value of Hunter's manager fees. It is the responsibility of the parties, not the court, to propose values to marital property and the parties are bound by the evidence they present. As we said in Syllabus Point 8 of *Mayhew v. Mayhew*, 197 W.Va. 290, 475 S.E.2d 382 (1996), "[t]he burden is on both parties to the litigation to adduce competent evidence on the values to be assigned in equitable distribution cases." Likewise, in Syllabus Point 3 of *Roig v. Roig*, 178 W.Va. 781, 364 S.E.2d 794 (1987), this Court stated, "When the issue in a divorce proceeding is the equitable distribution of marital property, both parties have the burden of presenting competent evidence to the trial court concerning the value of such property."

27. During the January, 7, 2008, hearing, and at other times, the family judge expressed his frustration with the case being continued "at least six times" at the parties' request. In another example, in the family court's September 5, 2007, denial of a request for a continuance, the court noted: "This case has been pending since June 2005; there have been multiple continuances; final hearing has been set for 4 months; there is insufficient court time available to reschedule expeditiously; and denial is necessary to ensure compliance with the RPPFC."

28. This Court found numerous factual errors within the circuit court's March 25, 2009, order.

For example, on page two of the order, the circuit court states, "at the time of the parties' separation on June 1, 2005, …." As stated, the parties stipulated to May 31, 2005, as their date of separation. Moreover, the listed amounts provided in that order regarding the stipulated amounts for the net marital estate, the amount advanced by Mr. Wilson towards Ms. Wilson's share, and even the agreed upon amount of marital debt, were all incorrect as provided in the circuit court's final order. While there are many additional examples, the point is that the accuracy of an order by a court is of utmost importance to the administration of justice.

Based upon all the above, in particular our conclusion that the value of Hunter's manager fees are separate and distinct from a determination of personal or enterprise goodwill, this case will be remanded to the family court for further proceedings consistent herein. To that end, and based on the lack of accurate and/or complete information contained in the record by way of testimony or documentary evidence on this issue, the family court must take additional evidence, solely for the purpose of making appropriate calculations to determine the value of Hunter's manager fees at the time of the parties' separation for a final determination regarding that value for purposes of equitable distribution. The evidence in the record indicates that four of the six projects are completed, while the remaining two projects, WestVaco and The Point, were 95.3 percent and 82.3 percent complete, respectively, as of March of 2008. Given that it is now more than two-and-one-half-years later, it may be that all six of the projects are now completed, which will provide for a determination of the value of Hunter's manager fees at the date of separation. In the event that either or both of the two projects remain unfinished, the family court shall retain jurisdiction and make a final determination upon their completion.

In summary, the circuit court erred in denying Ms. Wilson's motion for reconsideration. The circuit court did not abuse its discretion in determining that Hunter did not have an enterprise goodwill value for purposes of equitable distribution. Therefore, the circuit court properly reversed the family court's November 21, 2008, holding which ordered Mr. Wilson to pay Ms. Wilson the sum of $4,914,582.50 based upon a finding of enterprise goodwill. However, the circuit court did commit reversible error in its order by requiring Ms. Wilson to pay Mr. Wilson the sum of $894,286.00 based upon a construction spending theory. This Court has determined that Hunter's manager fees on the projects at the date of separation are subject to equitable distribution. However, it is impossible to calculate the fees based upon the current evidence of record. Thus, after thoroughly reviewing the record and considering all of the parties' arguments, this Court remands this case to the family court to award the appropriate relief consistent with this opinion. Upon remand, the family court shall hold a hearing for the sole purpose of determining an accurate value of Hunter's manager fees at the time of the parties' May 31, 2005, separation. After the evidence is taken, the trial court should make thorough findings of fact and conclusions of law in reaching its valuation, and should then proceed to the division of any such fees that are ascertained to be marital property.

## IV.

### CONCLUSION

Accordingly, the final order of the Circuit Court of Berkeley County dated June 4, 2009, is reversed. Likewise, the final order of the circuit court dated March 25, 2009, is affirmed, in part, and reversed, in part, and remanded to the family court for further proceedings consistent with this opinion.

Affirmed, in part, reversed, in part, and remanded with directions.

Chief Justice DAVIS and Justice BENJAMIN dissent and reserve the right to file dissenting opinions.

DAVIS, C.J., dissenting:

(Filed Nov. 30, 2010)

In this proceeding, the family court judge found that a company jointly owned by the parties, the Hunter Company, was valued at $8,927,957.00 as of the date of separation of the parties and that the company had only enterprise goodwill. The family court awarded Mrs. Wilson $4,914,582,50 as her equitable share of the Hunter Company. The circuit court reversed the family court rulings and determined that the Hunter Company had a negative value of $2,196,915.00 and that the company had only personal goodwill. As a consequence of the negative value of the Hunter Company, the circuit court set aside the award of $4,914,-582,50 to Mrs. Wilson and further determined that Mrs. Wilson owed Mr. Wilson $894,286.00. The majority opinion has determined that the circuit court was correct in finding the Hunter Company had only per-

sonal goodwill, but that the circuit court committed error in finding the company had a negative value. I would have reversed the circuit court's order in its entirety and reinstated the family court order. Consequently, I dissent from the disposition of this case by the majority opinion for the reasons set out below.

**The Circuit Court and Majority Opinion Did What No Expert Could do: Reject the Valuation of the Hunter Company by Mrs. Wilson's Expert and Find That Mr. Wilson Had Personal Goodwill in the Hunter Company**

The parties stipulated that the value of their marital assets, *excluding* the value of the Hunter Company stock they owned, was $11,587,324.02. In other words, both parties could afford to have experts testify on their behalf. However, Mrs. Wilson was the only party to retain an expert to offer advice to the family court and appellate courts on the value of the Hunter Company and whether or not personal or enterprise goodwill existed in the company. Mr. Wilson's attorneys *did not offer any expert* to testify to these issues.[1]

I submit that, because of the personal wealth of Mr. Wilson, there was clearly no financial impediment to his attorney's procuring an expert to testify to the issue of value of the Hunter Company and Mr. Wilson's claim for personal goodwill. Given the importance of this issue, the only reasonable explanation for the failure to obtain such an expert is that no expert could provide an opinion that was favorable to Mr. Wilson. Thus, in my judgment, Mr. Wilson's highly experienced attorneys could not find an expert who could ethically do what the circuit court and the majority opinion have done: contest the value of the Hunter Company as calculated by Mrs. Wilson's expert, and opine that Mr. Wilson had personal goodwill in the company. To be clear, no expert made these conclusions. The plain and simple truth is that these unsupportable conclusions are the result of improper judicial activism.

**A. Mr. Wilson Did Not Provide Expert Testimony on the Issue of the Value of The Hunter Company**

The record in this case shows that the circuit court found that Mr. Wilson's evidence demonstrated that the Hunter Company had a negative value of $2,196,915.00. The majority opinion rejected this conclusion and found that insufficient evidence existed as to the value of the Hunter Company. To reach this conclusion the majority opinion, like the circuit court's order, disingenuously ignored the only expert testimony provided on this issue. That expert testimony was presented by Mrs. Wilson's expert. The case law of this Court has made clear that "[t]here is little doubt that in valuing ... a business or property which [has] been found to be [a] marital asset[ ], *expert witnesses are needed.*" *Bettinger v. Bettinger*, 183 W.Va. 528, 544, 396 S.E.2d 709, 725 (1990) (emphasis added) citing *Tankersley v. Tankersley*, 182 W.Va. 627, 390 S.E.2d 826 (1990); *Shank v. Shank*, 182 W.Va. 271, 387 S.E.2d 325 (1989). Through flawed analysis, the majority opinion rejected the opinion of Mrs. Wilson's expert and decided to give Mr. Wilson another opportunity to present expert testimony on the issue of the value of the Hunter Company. As I will demonstrate, Mrs. Wilson presented competent evidence on the value of the Hunter Company through her expert.

The record before the family court was uncontested in showing that, in August 2004, Mr. Wilson sought a loan from a bank in the amount of $14,400,00.00, for the purpose of developing properties. To obtain the loan, Mr. Wilson represented that his total personal assets were valued at $20,311,641; which included the value of the Hunter Company. An August 4, 2004, financial statement signed by Mr. Wilson and submitted to the bank showed the value of the Hunter Company as being $10,159,411.

The record also indicates that, subsequent to the loan commitment by the bank, Mr. Wilson was required to provide the bank with updated financial statements. Mrs. Wilson introduced into evidence an unsigned financial statement dated February 7, 2005,

---

1. The circuit court's order specifically noted that, "Mr. Wilson offered no trial expert[.]"

that was in the possession of the bank and the Hunter Company, which showed the value of the Hunter Company to be $14,981,018.72.[2]

Mrs. Wilson's expert, Kenneth Apple, valued the company at $9,381,420.00.[3] This valuation was based upon the net profits of three projects the Hunter Company had. It is not disputed that Mr. Apple used generally accepted accounting principles (GAAP) in reaching his conclusion. The information relied upon by Mr. Apple was supplied by Mr. Wilson in response to discovery requests.[4]

·Mr. Wilson called as witnesses, but not as experts, Mr. Alan Murray, who was an accountant for National Land Partners, and Ms. Joan Holtz, who was an accountant for the Hunter Company. These two witnesses introduced evidence, over the objections of Mrs. Wilson, that included financial data that had not been turned over to Mrs. Wilson as required during discovery. Mr. Murray and Ms. Holtz offered testimony as to the value of the Hunter Company under a theory called construction spending theory.[5] This purported theory was not based upon, and in fact, was inconsistent with, GAAP. Utilizing this spurious theory, the witnesses testified that the Hunter Company was improperly paid fees by National Land Partners and, therefore, the Hunter Company had a negative value of $2,680,672.00.

The family court heard the non-expert testimony of Mr. Wilson's witnesses as to the value of the Hunter Company, as well as the testimony of Mrs. Wilson's expert. The family court rejected the testimony of Mr. Wil-

son's witnesses as being inconsistent with his representations to a bank that the company had assets of over $10,000,000.00 just shortly before the parties separated. Further, the family court found that the valuation of $9,381,420.00 by Mrs. Wilson's expert was consistent with the representations made by Mr. Wilson to the bank, i.e., that the company was worth more than $10,000,000.00.

The circuit court and majority opinion disregarded the evidence of Mrs. Wilson's expert, which was corroborated by financial statements given to a bank, and, in effect, took the position that Mr. Wilson was being less than candid to the bank when he represented that the Hunter Company was worth more that $10,000,000.00. The circuit court opinion found no problem with using its unsupportable conclusion to require Mrs. Wilson to pay to Mr. Wilson $894,286.00. The majority opinion decided against adopting the extreme conclusion of the circuit court. Instead, the majority opinion took an opposite extreme conclusion and decided to simply reject the corroborated value of the Hunter Company given by Mrs. Wilson's expert and to give Mr. Wilson a second opportunity to value the company. There is simply no justification for allowing Mr. Wilson to do that which he failed to do when given the opportunity, and to penalize Mrs. Wilson for doing that which the law required.

## B. No Expert Testified That Mr. Wilson Had Personal Goodwill in the Hunter Company

After concluding that Mr. Wilson deserved a second opportunity to offer expert testimo-

---

2. Although the circuit court disregarded the February financial statement because it was not signed by Mr. Wilson, this fact is of no moment. What is indisputable is that the bank made a loan commitment to Mr. Wilson based upon representations that the Hunter Company was valued at more than $10,000,000.00.

3. The family court adjusted this figure to arrive at a value of $8,927,957.00.

4. The circuit court and majority opinion took issue with the fact that Mr. Apple did not include additional projects that the Hunter Company worked on. The data used by Mr. Apple was the only complete project financial data that Mr. Wilson disclosed during discovery. Mr. Apple noted in his final report that additional financial data for other projects were belatedly disclosed,

but that he "could not utilize these statements in [his] analysis because they do not project future sales and expenses. These financial statements are not prepared using generally accepted principles[.]" In other words, Mr. Wilson failed to disclose all the data needed for a complete report. More important than the fact that Mr. Wilson failed to disclose all the data needed for a complete report, is the fact that Mrs. Wilson was willing to leave money on the table to get on with her life. This is to say that, if Mr. Wilson had disclosed the financial data for all of the projects, the net value of the company would have increased, not decreased—this is the reason why all the data was not disclosed.

5. Like the majority opinion, my research failed to disclose any state or federal case, or law review article, discussing this theory.

ny on the value of the Hunter Company, the majority opinion went on to reach the unsupportable conclusion that Mr. Hunter had personal goodwill in a company the majority opinion could not place a value on.

The record indicates that the Hunter Company's business is that of acquiring and subdividing land, building roads, and selling real estate for National Land Partners. The properties were the "product" that the Hunter Company was selling for National Land Partners. The circuit court and the majority opinion took the position that, because Mr. Wilson was selected by National Land Company to be a conduit for selling its properties through the Hunter Company, Mr. Wilson was indispensable. Consequently, the circuit court and the majority opinion found that Mr. Wilson had personal goodwill in the Hunter Company as a result of developing and selling real estate for National Land Partners. The record is clear in showing that no expert testified to this conclusion, because Mr. Wilson did not retain an expert to testify on the issue of personal goodwill.

Personal goodwill has been described as " 'that part of increased earning capacity that results from the reputation, knowledge and skills of individual people.' " *May v. May,* 214 W.Va. 394, 400, 589 S.E.2d 536, 542 (2003) (quoting Diane Green Smith, " 'Til Success Do Us Part: How Illinois Promotes Inequities in Property Distribution Pursuant to Divorce by Excluding Professional Goodwill," 26 J. Marshall L.Rev. 147, 164–65 (1992)). Personal goodwill "is a personal asset that depends on the continued presence of a particular individual and may be attributed to the individual owner's personal skill, training or reputation." Syl. pt. 3, in part *May.* More importantly, this Court has recognized that the determination of personal goodwill must be based upon expert testimony. This Court alluded to this fact in *May,* when we recognized that " '[o]n appeal, if it appears that the trial court reasonably approximated the net value of the practice and its goodwill, if any, based on competent evidence and on a sound valuation method or methods, the valuation will not be disturbed.' " *May,* 214 W.Va. at 407, 589 S.E.2d at 549 (quoting *Conway v. Conway,*

131 N.C.App. 609, 508 S.E.2d 812, 818 (1988)). *See also Helfer v. Helfer,* 224 W.Va. 413, 416 n. 1, 686 S.E.2d 64, 67 n. 1 (2009) ("In the instant appeal, however, the experts' reports and testimony are crucial to our determination that the family court committed no error in concluding that Appellee's chiropractic business has an enterprise goodwill value of zero."); *Gaskill v. Robbins,* 282 S.W.3d 306, 315 (Ky.2009) ("[G]oodwill can have pecuniary value if the trial court finds that there is reasonable evidence to support its value. In reaching a value, the trial court must have a rational basis for applying given accounting principles. Its decision must be supported by adequate evidence, and should avoid speculation and assumptions as much as possible.").

Expert testimony is crucial to the issue of goodwill because goodwill must be given a valuation. Determining that valuation is done through accounting methods. This court has recognized that there are five major and acceptable valuation formulas: "the straight capitalization method; the capitalization of excess earnings method; the IRS variation of capitalized excess earnings method; the market value approach; and the buy/sell agreement method." *Helfer,* 224 W.Va. at 422 n. 19, 686 S.E.2d at 73 n. 19. In the instant proceeding, Mr. Wilson failed to present expert testimony *on any* of the methods for determining and valuing personal goodwill. For this reason the family court correctly rejected mere assertions by Mr. Wilson that he had personal goodwill in the Hunter Company. The majority opinion joined the circuit court in leaping into the abyss and summarily concluding that Mr. Wilson had personal goodwill.

One of the factors used to assess personal goodwill is whether or not the customer base of a business would suffer if a key person left that business. *See Williams v. Williams,* 82 Ark. App. 294, 108 S.W.3d 629, 646 (2003) ("Furthermore, appellee's expert failed to adequately account for the reduction in patient revenues that would be associated with appellant's departure from the practices. For these reasons, and because appellant's expert, Ms. Shuffield, did in fact include enterprise value in her valuation of the practices,

we cannot say that the trial judge erred in crediting her valuation over that of Mr. Schwartz."); *Skrabak v. Skrabak*, 108 Md. App. 633, 673 A.2d 732, 736 (1996) ("The traditional definition of goodwill is the probability that the old customers will resort to the old place." (internal quotations and citation omitted)).

Insofar as the Hunter Company existed only to the extent that the National Land Partners utilized it to develop and sell properties, the Hunter Company's only client was National Land Partners. There was no evidence that National Land Partners would stop utilizing the Hunter Company if Mr. Wilson was no longer employed by the company. In fact, the management agreement between the Hunter Company and National Land Partners specifically required hiring a new person to fill Mr. Wilson's role with the company in the event that he died or became incapacitated. Although there was evidence that the National Land Partners valued Mr. Wilson's aggressiveness in developing their properties, the management agreement alone clearly established that National Land Company was prepared to continue using the Hunter Company as a conduit for developing and selling real estate in West Virginia *regardless* of whether Mr. Wilson remained as manager of the company.

In finding that Mr. Wilson had personal goodwill in the Hunter Company, the circuit court relied upon cases that are factually distinguishable from the instant matter. The majority opinion failed to rely on any case. The circuit court cited to the decision in *Matter of Marriage of Lankford*, 79 Or.App. 742, 720 P.2d 407 (1986). In *Lankford* the wife contended that her husband's logging business should have been valued at a higher amount because it was a "going concern."

The appellate court rejected the argument on the grounds that the logging business was tied to the husband's ability to negotiate contracts with potential customers. The circuit court also cited to the decision in *In re Marriage of Foley*, 163 Ill.App.3d 1, 114 Ill. Dec. 300, 516 N.E.2d 455 (1987). In that case the husband owned an electrical parts company. The issue on appeal by the wife was not whether personal goodwill existed. The wife argued that some portion of the company's value should have been attributed to enterprise goodwill. The appellate court found that the nature of the husband's business did not generate any goodwill outside of him.[6]

The decisions in *Lankford* and *Foley* found personal goodwill in the businesses at issue because those businesses relied upon the ability of the owners to obtain customers. However, Mr. Wilson is not needed in order for the Hunter Company to obtain customers, because its only customer is National Land Company.[7] And, as previously shown, National Land company was prepared to continue using the Hunter Company regardless of Mr. Wilson's presence.

Moreover, the circuit court and majority opinion supported their conclusion of personal goodwill based upon the erroneous conclusion that Mr. Wilson was the only employee of Hunter Company. This finding is simply disingenuous. During the proceeding before the family court, Mr. Wilson put on evidence that the Hunter Company had 20 employees. Mrs. Wilson presented evidence that the company had 25 employees. Further, the management agreement between the Hunter Company and National Land Company required the Hunter Company to arrange for the employment of persons to manage, operate, develop and market the properties.[8] In

---

6. The circuit court also cited to the decision in *Bertholet v. Bertholet*, 725 N.E.2d 487 (Ind.Ct. App.2000). That case involved the issue of whether personal or enterprise goodwill existed in a bail bond company. The appellate court did not decide the issue because the record was inadequately developed. The case was remanded for a determination of the issue.

7. Even if I assumed that the people who purchased National Land Partners' properties were customers of the Hunter Company, there was not

a shred of evidence showing that such customers would stop purchasing National Land Partners' properties if Mr. Wilson left the Hunter Company.

8. The management agreement also required the Hunter Company to utilize a company called Inland Management Corporation to act as paymaster for the employees. The Hunter Company was also able to utilize the services and employee benefit packages of Inland Management Corporation. The majority opinion contorted the ar-

spite of this evidence that Mr. Wilson was not the only employee of the Hunter Company, the circuit court and majority opinion found that Mr. Wilson was the only employee. This illogical conclusion had to be reached in order to justify finding that Mr. Wilson had personal goodwill in the Hunter Company.

In sum, the only credible evidence of goodwill was that provided by Mrs. Wilson's expert, who found that only enterprise goodwill existed in the Hunter Company. This Court stated in syllabus point 2 of *May* " '[e]nterprise goodwill' is an asset of the business and may be attributed to a business by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business." Under the management agreement between National Land Company and the Hunter Company, National Land Company was committed to being the sole client of the Hunter Company regardless of who its manager was. This type of commitment is enterprise goodwill.

It is critical to understand the significance of what the majority opinion did in affirming the circuit court's personal goodwill finding. The circuit court summarily found personal goodwill, without any expert testimony, because it had determined that the Hunter Company had a negative value. In other words, the circuit court's order did not place a value on the purported personal goodwill because it had found the Hunter Company was, in essence, bankrupt. Insofar as the circuit court was concerned, the issue of personal goodwill was meaningless because Mr. Wilson could not benefit from such a finding. The majority opinion has now placed an unknown value on that personal goodwill, because it has determined that Mr. Wilson should have a second opportunity to place a value on the Hunter Company. This is a grave injustice because Mrs. Wilson did exactly what the law required in providing expert testimony on the issue of personal goodwill and enterprise goodwill. Mr. Wilson flaunted our legal requirements and is being rewarded with a second opportunity to show

that he has personal goodwill that could exceed ninety percent of the value of the Hunter Company, when he failed, in the first instance, to provide any expert testimony to prove that he in fact had personal goodwill in the company.

The ultimate result of the majority opinion is that expert testimony is no longer needed to decide the issue of whether personal goodwill exists. Litigants can now simply come into court with lay testimony on the issue of personal goodwill, and thereafter provide lay testimony as to the valuation to be assigned that personal goodwill.

For the reasons set out, I dissent. I am authorized to state that Justice Benjamin joins me in this dissenting opinion.

rangement with Inland Management to make appear as though the Hunter Company employ-

ees were in fact employees of National Land Company.