# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Whitney L. Moore, Appellant/Respondent,

v.

Arthur R. Moore, III, Respondent/Appellant.

Appellate Case No. 2013-001359

———————————

Appeal from Charleston County
Vicki J. Snelgrove, Family Court Judge

———————————

Opinion No. 27579
Heard February 5, 2015 – Filed October 7, 2015

———————————

## AFFIRMED IN PART, REVERSED IN PART

———————————

Timothy E. Madden and Reid T. Sherard, both of Nelson
Mullins Riley & Scarborough, LLP, of Greenville for
Appellant/Respondent.

Donald B. Clark and Margaret D. Fabri, both of
Charleston for Respondent/Appellant.

———————————

**JUSTICE KITTREDGE:** This domestic relations matter comes before us on
cross-appeals from Whitney Moore (Wife) and Arthur Moore, III, (Husband) from
an order of the family court valuing and dividing the parties' closely held business,
Candelabra. We affirm the family court's inclusion of Wife's enterprise goodwill
in the business as marital property. We, however, modify the valuation and
equitable division award, and for the reasons explained below, we direct Wife to
pay to Husband the sum of $338,525, together with interest at the rate directed by

the family court, calculated from the date of the family court final order, within ninety days of the sending of the remittitur to the family court pursuant to Rule 221, SCACR.  We reverse the award to Husband of $122,557 in expert witness fees.

## I.

In appeals from the family court, this Court reviews factual and legal issues de novo.  *Simmons v. Simmons*, 392 S.C. 412, 414–415, 709 S.E.2d 666, 667 (2011).  Thus, this Court has jurisdiction to find facts in accordance with its own view of the preponderance of the evidence.  This broad scope of review, however, does not require the Court to disregard the findings of the family court, which is in a superior position to make credibility determinations.  *Lewis v. Lewis*, 392 S.C. 381, 385, 709 S.E.2d 650, 651–52 (2011).  We have carefully reviewed the approximately 3500-page record, and we commend the excellent family court judge for her thoughtful handling of this contentious and difficult case.

## II.

### A.

The parties met and began dating when they were living in Charlotte, North Carolina.  They were married on June 9, 2001, and lived throughout the marriage in Charleston County, South Carolina.  Two children were born of the marriage. The parties separated in March 2011.

Wife graduated from the University of North Carolina at Greensboro in the early 1990s with a four-year degree in textile products marketing and a minor in business.  Upon graduation, Wife was employed with Belk department store in its two-year executive training program, which she described as "kind of extended schooling," through which she learned the "ins and outs of retailing" and "shadow[ed] everybody from the bottom to the top."

In the five years following the Belk executive training program, Wife held various positions within the Belk company, including area sales manager, assistant buyer, a position with the payroll and productivity department, and a "co-op" position through which Wife was employed by both Belk and clothing vendor Tommy Hilfiger.  Wife testified that during her employment with Belk and Tommy Hilfiger, her responsibilities involved scheduling/staffing; budgeting; managing sales, costs, and shrinkage; creating purchase orders; building and enhancing

working relationships with vendors; selecting product from various lines and vendors; determining the amount of product needed at various stores; conducting sales and product merchandising seminars throughout a ten-store area; and assisting with the development of a special productivity initiative designed to more effectively manage staffing costs and enable further reductions in product pricing.

Husband studied corporate communications at the College of Charleston, where he also played baseball. After college, he was drafted to be a pitcher for the Florida Marlins in 1995, but injuries early on foreclosed the opportunity for a major league career. Thereafter, Husband "took a little break" and worked for a golf facility on Hilton Head Island for a few months before taking a sales position with Alltel Communications in Charlotte.

## B.

After the parties met in Charlotte and began dating, Husband accepted a position selling medical supplies to nursing homes and prisons for Neighborcare, which required him to relocate to Charleston. Wife followed Husband to Charleston in late 1999 and briefly held a commission-only position selling fashion eyewear to optometrists throughout South Carolina before opening her own lighting and design business in April 2001, just before the parties married.[1] Throughout his tenure at Neighborcare, Husband traveled frequently throughout the state and earned $170,000 to $185,000 per year. Wife drew some money out of Candelabra in the early years to contribute to household expenses, but it was Husband who paid the bulk of the household expenses.

Candelabra is a retail business located on Coleman Boulevard in Mount Pleasant that sells trendy, high-end boutique lighting, home furnishings, and home accessories in a retail showroom. Within the last several years, a growing percentage of Candelabra's business has come from a developing base of internet sales. Candelabra does not manufacture any products; rather, it sells products manufactured by various vendors on a non-exclusive basis.

Candelabra is a registered S-Corp, with 51% of the stock titled in Wife's name and 49% titled in Husband's name. From the beginning, Wife has served as the

---

[1] Wife initially opened the store under the name of Katyna Lighting and Design in partnership with a former friend. When that partnership dissolved, Wife continued in business and changed the name to Candelabra.

President of Candelabra and has been responsible for overseeing all business operations: financial forecasting and management, budgeting, hiring, scheduling, training, merchandising, and most importantly, selecting and displaying all of the products. By all accounts, Wife is an experienced, successful businesswoman with an exceptional "eye for design," a knack for selecting specific products that appeal to her customers and consistently generate sales, and the ability to create long-term, positive relationships with vendor and manufacturer representatives.[2]

## C.

When Candelabra first opened in 2001, the Charleston housing market was experiencing a boom, and Wife was able to grow the business by establishing relationships with lighting vendors and with various subcontractors, particularly those working in the I'On development in Mount Pleasant, who continued to do business with Candelabra after completion of the I'On development.

As sales continued to grow, Wife determined that Elizabeth Goff, a key Candelabra employee, should be dedicated exclusively to builder and contractor sales. In the early years of Candelabra's existence, Wife's growth strategy was to continue to nurture the existing contractor relationships, primarily through Goff, while also establishing new relationships with other contractors and interior designers, and expanding Candelabra's product offerings to include more than just lighting. At that time, internet retailing was not well-established among small businesses, so there was no internet component to Candelabra's business.

Although Husband had held the title of Candelabra's Vice President since the time of incorporation, other than assisting Wife in preparing the store for the grand opening and intermittently serving as the "muscle" to help move, hang, or deliver heavier items, Husband was not actively involved in the business prior to 2005. However, several things occurred in 2005 that impacted Candelabra and the parties' working arrangements. First, after experiencing four miscarriages, Wife had become pregnant and was having a difficult pregnancy that, at times, required her to be on bed rest, thereby reducing the amount of time she was able to spend at the store. Around the same time, Husband's employer, Neighborcare, was bought out by another company, and Husband's position was eliminated. Thereafter, Husband began spending more time at Candelabra such that he considered his

---

[2] In 2007, Candelabra won a prestigious industry award for being the best lighting store in the southeastern United States. Candelabra was nominated for this same award in 2012.

work there to be his full-time employment, and he did not seek any other type of employment.[3]

In the fall of 2005, while Wife was on maternity leave with the couple's first child, Husband determined that Wife's strategy aimed at contractor sales was too tedious and time-consuming, and Husband unilaterally determined that the better sales-generation strategy would be to pursue large corporations and multi-unit dwellings, such as the 122-unit Tides Condominium project in Mount Pleasant. Candelabra eventually landed the Tides project.

Goff had difficulty working for Husband, and she resigned her position at Candelabra when Wife returned to work from maternity leave. Candelabra lost business when Goff left and took the contractor business with her. As Wife testified:

> It was bad business to throw away all of our old contractors in lieu of a one-time deal no matter what it was making us and I knew that. It didn't mean we shouldn't take it on, [but] we needed to structure it where we could keep our contractors and keep our other business flowing and then have somebody who worked the Tides additionally.
>
> . . . .
>
> I've never been in a business where you take the one shot quick fix fast money deal in lieu of letting go of your constant and consistent business that you built relationships with because when you nip that off in the bud and the Tide[s are] gone, you might not have anything else left because the Tides is a one shot deal. . . . It's nothing you can really grow your business on if you're not continuing good business with your other contractors. And when [Husband] came in and talked

---

[3] According to Wife, the couple never had a discussion about what Husband's next career move would be; rather, "[h]e just started kind of going into Candelabra," despite her impression that his career would be continuing in outside sales. Husband testified that he saw how difficult the pregnancy was for Wife, and regardless of whether she asked for his help, he decided he would not seek other employment so he could spend more time helping out at Candelabra.

with [Goff] about giving up contractors and that we weren't going to go that route anymore, she was dumb founded and she left, and she took the contractors and we were left with the Tides.[4]

During this same period of time, the parties were experiencing marital discord as well. The evidence demonstrates Husband has a violent temper. A particularly intense disagreement occurred during the spring of 2007, in which Husband became so angry that he threw a drink glass at Wife, narrowly missing her. Husband then grabbed the couple's child, who witnessed the incident, and locked himself and the child in the child's bedroom. As a result of this altercation, the parties separated for several months but reconciled in September 2007, when Wife discovered she was pregnant with the couple's second child, who was born in May 2008. Wife returned to Candelabra full-time after her second maternity leave, assuming all of her previous managerial responsibilities, while also being the children's primary caregiver.

During 2007, Husband urged Wife to sell Candelabra, attributing the problems in their relationship to the pressures of running the business. Wife did not want to sell the business, but she acquiesced, and the business was listed for sale. Eventually, a buyer agreed to purchase Candelabra with the intent of turning it into a website business. The agreed-upon purchase price was $1.7 million, which the parties felt was a "surreal" price given the business was not, in their opinion, worth that much; however, the buyer backed out and the sale fell through around the fall of 2008.

By that time, the recession had hit, and the business was seriously struggling.[5] Candelabra had a website, but it was very simplistic—providing basic information about the store and not offering online purchases. Sometime after a discussion with Wife's father, the parties began aggressively pursuing a website business to counteract the drop in sales from the downturn in the economy, and Candelabra re-focused its efforts towards creating a better sales and distribution network via the internet.

---

[4] Eventually, Husband recognized his poor judgment and attempted to win back the contractor business Candelabra had lost, to no avail.

[5] Candelabra suffered net operating losses of $105,919 and $97,487 in 2008 and 2009 respectively.

**D.**

Recognizing that online retailing presented a lucrative business opportunity, the parties began the process of transforming Candelabra's website from one that offered only information about the physical storefront into one that became the central feature of Candelabra's business operations. Today, the www.shopcandelabra.com website allows customers to shop the store's current products and functions as a portal through which customers may place online purchases. The website's home page allows users to shop for merchandise by category (lighting, furniture, home décor, etc.), subcategory (chandeliers, pendants, lamps, etc.), or by current trends in the lighting and interior design industry. Because Candelabra's target customer is very brand-oriented, the website also allows users to sort product by the brands of merchandise Candelabra carries.

Additionally, the parties implemented a robust online marketing campaign to increase the website's online presence, including search engine optimization (SEO) techniques, through which the contents of www.shopcandelabra.com are made to appear particularly relevant to the algorithms of search engines like Google. Because many customers are drawn to Candelabra's website through the specific brands, the SEO campaign was implemented one brand at a time and was geared towards keywords associated with the brand and the best-selling products from each brand.

**E.**

Ultimately, this strategy shift proved successful, to the point that as much as 80% of Candelabra's total sales were generated by the website.[6] However, it is from this point forward that the parties provide vastly different accounts of each of their contributions toward the creation and implementation of the revamped Candelabra website. Husband claims the website was his idea, that Wife did not want the website, that he educated himself on the website creation process and that he had to drag Wife kicking and screaming into the technological age. According to Husband, Wife was not a part of the development of Candelabra's website, and the key to the success of the site is attributable solely to his efforts in hiring key

---

[6] By year-end 2010, Candelabra's net operating income had rebounded to $45,484, and in the first six months of 2011, Candelabra's net operating income was $240,306.

personnel and in researching and implementing the SEO campaign to increase sales through the Candelabra website.

According to Wife, she supported the Candelabra website. In fact, she was the one who found the first website builder in 2005 through her connections in Greensboro, North Carolina. And although Husband and a Candelabra employee named Meredith were the first ones to meet with the second website builder, who ultimately helped the parties revolutionize the website, Wife testified, and credibly in our judgment, that she was the decision maker as to the website design and content:

> I was the one that sat down and told [second website builder] this is what I think we can do. This is what I think is going to be hard. Nobody is really doing this in the internet right now with high end design lighting. The designer lighting companies are not getting it yet. They are not putting minimum price points. We ship this one, we're not going to make any money. . . . We started talking about it and weeding it out and what brands we could list and how we were going to structure it. I showed them my Oly model of what I was doing. We changed it up . . . mixing in a few other websites that we liked. I did—I gave them the products. I gave them the words. I gave them the layout.

We find the evidence supports Wife's contention that her design of the website and her decision to create different brand "shops" within the website were inspired by what she learned at Belk and through her experience merchandising clothing.

Wife acknowledged that Husband was in favor of expanding the website and was very helpful in finding people to get the new and improved website going. However, Wife stated:

> I worked on the website [] more with Meredith and more with the [outside website] people than [Husband] ever did. [Husband] talked about it a lot. . . . I will admit he found some key people to help us. But, physically and anything he did himself to put into that website, it was all given to him from the companies that we had hired. And, yes, [] he had helped to find some of the companies. . . . He was reading books [about building websites] all the time. . . . [H]e would also read books on the greatest family man and things like that as well. He read [all sorts of] books all the time. I don't know if he thought when he

read it that that meant he did it. I don't know. But, he read books. I never saw anything that he ever did in reading books come to fruition.

In terms of the development of the website branding over time, Wife further testified:

> [Husband] would shoot out a lot of ideas, but he wouldn't work on the ideas. I worked on the ideas. There needed to be timelines. You grow to[o] fast and you can bottom out. There were things we were ready for. There were things we weren't ready for. There was only so much you could do. We couldn't even get the brands that were getting on [the website] at the time to look decent yet.
>
> So in order to make the site grow right, I had a plan. I had brands that were going to be coming on. [Husband] wakes up one morning and decides that there needs to be ten new brands on the website and that's it. That's a done deal. [Wife], we need ten new brands on the website.
>
> . . . .
>
> What we didn't agree on is that [Husband] would come to me and say that we needed to be doing this or that we needed to be doing this, but then he wouldn't do anything and I had to do it. That's what the arguments were on. . . . The website is a very good example. He wanted this great website. There were some people in there that he put into key positions. And, I struggled to do the website, and the front of the store, and everything, and kept it up, and yet he would look at me and say I didn't want the website. But, he wasn't doing anything on the website.

In short, Wife stated, "If Sam Moore had not been my husband, . . . he would have been out [of Candelabra] a long time ago because he didn't do enough to acquire even what a part-time position would do."

In light of our review of the record, we find Husband vastly overstates his contributions to the implementation and management of the website development and that Wife is the party with industry knowledge, design background, and work

ethic that brought the website to fruition. Our careful review of the record convinces us that Husband was a purveyor of ideas, but he left the details of putting his ideas into action to others with a solid work ethic, such as Wife.

## F.

Just as Candelabra's sales began to increase, the parties' marriage was crumbling. Husband was frequently enraged, hurling vile and profane insults against Wife and others. After an especially threatening altercation in February of 2011, Wife asked Husband to leave the marital home.

For a brief period, both parties continued working at Candelabra. However, in May 2011, Wife, in her capacity as President and controlling shareholder of Candelabra, terminated Husband's employment. The family court litigation commenced in June of 2011. Since that time, Husband has had no involvement in Candelabra's operations by virtue of the family court's temporary order.

## III.

The family court granted Wife a divorce on the grounds of one year's continuous separation and awarded Wife custody of the couple's two children. Neither party was awarded alimony. The primary matter in dispute was the value of Candelabra[7] and the parties' requests for attorney's fees and expert witness fees.

As to the value of Candelabra, both parties presented the testimony of highly qualified expert witnesses. Wife's valuation expert, Raymond McKay, an attorney and a certified public accountant, opined that the unadjusted value of Candelabra as of June 30, 2011, was $1,200,000, of which approximately $846,000 represented goodwill. McKay opined that 20–25% of this goodwill value was personal to Wife and that without Wife, Candelabra's sales (and profits) would suffer. McKay also opined that the fair market value of Candelabra was not its full unadjusted value of $1,200,000; rather, McKay testified that value should be discounted by 20% to reflect the illiquidity or lack of marketability of shares of a closely held business such as Candelabra. Accordingly, McKay's ultimate opinion

---

[7] It is undisputed that Candelabra had fixed assets of $353,687 when marital litigation was filed. During the pendency of the appeal, and over Wife's objection, we granted Husband's motion for a disbursement of funds. We ordered Wife to pay Husband the sum of $176,843.50, to be credited against his share of the marital estate.

was that the adjusted fair market value of Candelabra was $960,000 as of June 30, 2011.

By contrast, Husband's valuation expert, Dr. Perry Woodside, valued Candelabra at $2,960,000 as of June 30, 2012—a date approximately one year after the marital litigation was commenced. Woodside did not calculate personal goodwill as part of his valuation, but conceded on cross-examination that some of the goodwill was personal to Wife, opining that Wife's personal goodwill was perhaps between 5–10%. Woodside also opined that Candelabra could be sold "fairly readily" so he did not believe it was appropriate to apply a lack of marketability discount.

Relying exclusively on the testimony of Husband's valuation expert, Woodside, the family court utilized a valuation date approximately one year after the commencement of marital litigation and found the value of Candelabra as of June 30, 2012, was $2,960,000, the majority of which was comprised of enterprise goodwill. Specifically, the family court determined that, of the company's overall goodwill, 10% represented Wife's personal goodwill, and as a result that percentage was excluded from the marital estate. The remaining 90%, excluding the fixed assets, constituted enterprise goodwill and was included in the marital estate, for it inhered to the business itself and was unrelated to the individual efforts of any single person.

The family court ordered an equal division of marital assets. The family court granted Wife first option to purchase Husband's interest in Candelabra, including a five-year period to pay Husband his share, together with interest. The family court further ordered Wife to pay Husband $122,557 in expert witness fees.

Both parties appealed. We certified the appeal pursuant to Rule 204, SCACR.

## **IV**.

Wife contends the family court erred in including *any* goodwill in the value of Candelabra and in awarding Husband $122,557 in expert witness fees. Husband asserts error in the family court allocating any part of the value of Candelabra to Wife's personal goodwill. Husband further claims the family court erred in allowing Wife a five-year period to pay his equitable division share. While substantial valuation questions are presented, the threshold issue is whether and to what extent the enterprise goodwill of Candelabra is a marital asset.

Courts throughout the country, including this Court, have struggled in how to resolve the issue of goodwill value in the domestic relations arena.  The family court seeks to achieve equity, yet in the quest for fairness, real world valuation principles are often and purposely ignored.  The familiar tension between a family court's goal of equity and recognized valuation principles may be explained, at least in part, due to the absence of a true willing buyer and willing seller in marital litigation.  The reality in a family court action is that there is rarely a true sale, for one spouse typically retains the business interest which is the subject of the goodwill valuation and apportionment dispute.  Another factor at play is the clear intent not to include future earnings as part of an equitable division award and also order an award of alimony based on those same earnings—in essence, to prevent the inequity of a double recovery.  In this regard, one of the common methods of valuing goodwill is by a capitalization of earnings.  The various factors and concerns explain South Carolina's categorical rule against the inclusion of personal goodwill in the marital estate.  For the first time, we are asked whether enterprise goodwill can be a marital asset subject to division.  While we ultimately answer the question in the affirmative, we do so cautiously, knowing that today's decision does not and could not possibly answer the myriad questions that will arise.

## A. Goodwill: Personal vs. Enterprise

At trial, the experts agreed that the fair market value of Candelabra's tangible assets as of June 2011 was $353,687.  However, the goodwill value of Candelabra, the value above and beyond its tangible assets, was the primary dispute at trial.

In a divorce action, the family court is tasked with identifying, valuing, and apportioning the marital estate.  *Gardner v. Gardner*, 368 S.C. 134, 136, 628 S.E.2d 37, 38 (2006) (citing *Johnson v. Johnson,* 296 S.C. 289, 293, 372 S.E.2d 107, 110 (Ct. App. 1988)); *see also* S.C. Code Ann. §§ 20-3-620 to -630 (2014) (defining marital property and setting forth the apportionment factors).

"The unanimous nationwide rule is that a[] [spouse's] ownership interest in a marketable business constitutes *property* which is subject to classification and division upon divorce."  2 Equit. Distrib. of Property, 3d § 6:72.  "The reason is fundamentally simple: the business can be sold for monetary consideration on the open market. . . .  [I]ndeed, there are essentially no rights which are transferable for consideration and which do not constitute property."  *Id*.

> When marketable businesses are bought and sold upon the open
> market, the actual negotiated price for the conveyance is often greater

than the total value of the tangible assets of the business involved. This difference is due to the fact that the income of a business depends upon many factors other than its assets. Many of these factors are transferred along with the business: for example, a convenient location, the reputation of a trade name, or even simply the probability that the old customers will resort to the old place. Because these factors are transferable, persons who purchase a business upon the open market are often willing to pay more than the total value of the business' individual hard assets. This additional element of value is called *goodwill.*

2 Equit. Distrib. of Property, 3d § 6:73 (internal quotation marks and footnotes omitted). Goodwill is considered an intangible asset. *See Weinberg v. Wallace*, 314 S.C. 183, 187–88, 442 S.E.2d 211, 213 (Ct. App. 1994). Thus, once goodwill is identified as an asset, the question then becomes whether and to what extent such goodwill should be considered a marital asset.

Many courts have recognized that goodwill may be a business asset or it may be a personal asset belonging to an owner-employee. *See, e.g.*, *Martin Ice Cream Co. v. Commissioner*, 110 T.C. 189, 207 (1998) (holding that a shareholder-employee's personal relationships amounted to personal goodwill and thus were not properly considered to be corporate assets and explaining "[t]hose personal assets are entirely distinct from the intangible corporate asset of [enterprise] goodwill") (citing *MacDonald v. Commissioner*, 3 T.C. 720, 727 (1944)).

"Enterprise goodwill is that which exists independently of one's personal efforts and will outlast one's involvement with the business." *In re Marriage of Alexander*, 857 N.E.2d 766, 769 (Ill. App. Ct. 2006). "Enterprise goodwill 'is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers.'" *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999) (quoting Allen Parkman, *The Treatment of Professional Goodwill in Divorce Proceedings,* 18 Fam. L.Q. 213, 215 (1984)). "[E]nterprise goodwill attaches to a business entity and is associated separately from the reputation of the owners. . . . The asset has a determinable value because the enterprise goodwill of an ongoing business will transfer upon sale of the business to a willing buyer." *Wilson v. Wilson*, 706 S.E.2d 354, 361 (W. Va. 2010). Many courts have found "[e]nterprise goodwill is an asset of the business and accordingly is property that is divisible in a dissolution to the extent that it

inheres in the business, independent of any single individual's personal efforts and will outlast any person's involvement in the business." *Yoon*, 711 N.E.2d at 1268–69 (citations omitted).

"In contrast, [p]ersonal goodwill is associated with individuals." *Wilson*, 706 S.E.2d at 361. "It is that part of increased earning capacity that results from the reputation, knowledge and skills of individual people." *Id.* "The implied assumption is that if the individual were not there, the clients would go elsewhere." Business Valuation Resources, LLC, *BVR's Guide to Personal v. Enterprise Goodwill* 19 (Adam Manson & David Wood eds., 2011) [hereinafter *BVR's Guide*]. "Accordingly, the goodwill of a service business, such as a professional practice, consists largely of personal goodwill." *Wilson*, 706 S.E.2d at 361. "[A]ny value that attaches to a business as a result of this 'personal goodwill' represents nothing more than the future earning capacity of the individual and is not divisible [in a divorce proceeding]." *Yoon*, 711 N.E.2d at 1269. In the family court setting, future earning capacity based on a spouse's reputation, knowledge and skills—personal goodwill—is considered nonmarketable and thus not property subject to division. *See Butler v. Butler*, 663 A.2d 148, 156 (Pa. 1995) ("[W]here there has been an award of alimony, . . . to also attribute a value to goodwill that is wholly personal to the professional spouse, would in essence result in a double charge on future income.").

One court noted the distinction as follows: "[w]here goodwill is a marketable business asset distinct from the personal reputation of a particular individual, as is usually the case with many commercial enterprises, that goodwill has an immediately discernible value as an asset of the business and may be identified as an amount reflected in a sale or transfer of a business." *Prahinski v. Prahinski*, 540 A.2d 833, 843 (Md. Ct. Spec. App. 1988) (citing *Wilson v. Wilson,* 741 S.W.2d 640 (Ark. 1987); *Taylor v. Taylor,* 386 N.W.2d 851 (Neb. 1986)). However, "[i]f the goodwill depends on the continued presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual." *Id.*

### B. Goodwill in South Carolina

This Court first considered whether goodwill should be treated as marital property in *Casey v. Casey* (*Casey II*), 293 S.C. 503, 362 S.E.2d 6 (1987) (reviewing a court of appeals' decision involving the valuation and equitable division of a retail fireworks business operated by the husband). Previously, in reviewing the family court's valuation of the fireworks business, the court of appeals commented that "[t]he question of how to handle the goodwill of a sole proprietorship is a

troublesome one," but the court of appeals ultimately concluded goodwill "may constitute a marital asset subject to division." *Casey v. Casey* (*Casey I*), 289 S.C. 462, 466, 346 S.E.2d 726, 729 (Ct. App. 1986). On certiorari, this Court reversed, finding "[w]hen the goodwill in a business is dependent upon the owner's future earnings, it is too speculative for inclusion in the marital estate," and noted "[t]he continued success of the [fireworks] business can be attributed largely to Husband's lobbying efforts to keep the sale of fireworks legal in South Carolina." *Casey II*, 293 S.C. at 504, 362 S.E.2d at 6–7.

In the years since *Casey II*, this Court has twice examined the issue of whether goodwill constitutes marital property, both in the context of goodwill inherent in professional dental practices. *See Dickert v. Dickert*, 387 S.C. 1, 7, 691 S.E.2d 448, 451 (2010) (rejecting a claim that the goodwill in the dental practice was enterprise goodwill and thus finding the goodwill was properly excluded from the marital estate); *Donahue v. Donahue*, 299 S.C. 353, 360, 384 S.E.2d 741, 746 (1989) (reversing family court's division of the goodwill of husband's dental practice because "[t]he very nature of a professional practice is that it is totally dependent upon the professional"). Although these cases seem to hold that goodwill in general is too speculative to be considered a marital asset, upon careful review, the goodwill at issue on the facts of each of these decisions was *personal* goodwill.[8]

Today, we recognize enterprise goodwill as marital property subject to equitable division. We continue to hold that personal goodwill, which follows the owner and is entirely dependent on the owner's personal or professional services and skills, is not marital property subject to division. However, we are persuaded that enterprise goodwill, which inheres in the business itself and is transferrable in the market, should be distinguished from personal or professional goodwill.

Accordingly, we elect to follow the emerging majority approach and hold enterprise goodwill is marital property subject to equitable division. *See Yoon*, 711 N.E.2d at 1272 ("To the extent goodwill is enterprise goodwill, it is divisible."). We make our decision fully aware of the certainty and ease that would necessarily result from a categorical rule excluding all goodwill from the marital estate. We nevertheless believe that today's decision will better enable family courts to achieve equity in the apportionment of marital estates and will prove to be

---

[8] *See also RGM v. DEM*, 306 S.C. 145, 410 S.E.2d 564 (1991) (recognizing that the fair market value of a marital business may include value above and beyond the business's hard assets).

workable. *See Powell v. Powell*, 648 P.2d 218, 223 (Kan. 1982) (explaining the question of whether and to what extent goodwill should be recognized as a marital asset "is, in the final analysis, a public policy issue"). To be sure, identifying, valuing, and equitably dividing enterprise goodwill will present challenges, as a practical matter. The fact that enterprise goodwill is intangible will invariably create differences of opinion as to the existence of enterprise goodwill and its value. Yet, experts are routinely involved in family court valuation disputes. We are confident that South Carolina's excellent family court judges are able to navigate through the myriad issues associated with the identification, valuation, and division of enterprise goodwill to achieve an equitable result.

## C. Distinguishing Personal Goodwill from Enterprise Goodwill

Before we address the specific facts of this case, we take the opportunity to provide further guidance to the bench and bar as to the distinction between personal and enterprise goodwill. Of course, a business may consist of both personal and enterprise goodwill, as does Candelabra. We emphasize that "before including the goodwill of a [] business or professional practice in a marital estate, a court must determine that the goodwill is attributable to the business as opposed to the owner as an individual." *Yoon*, 711 N.E.2d at 1269. "If attributable to the individual, it is not a divisible asset and is properly considered only as future earning capacity that may affect the relative property division." *Id.*

"The difference between personal goodwill and enterprise [] goodwill is easy to define conceptually, but sometimes difficult to measure." *BVR's Guide* at 37. Further, "not all businesses have goodwill." *Gaskill v. Robbins*, 282 S.W.3d 306, 311 (Ky. 2009). Thus, "to the extent a business or profession[al practice] has goodwill (or has a value in excess of its net assets) it is a factual issue to what extent, if any, that goodwill is personal to the owner or employee and to what extent it is enterprise goodwill and therefore divisible property." *Yoon*, 711 N.E.2d at 1270. The spouse claiming that goodwill should be included in the marital estate bears the burden of proving the goodwill at issue is enterprise goodwill and, thus, is properly considered marital property. *Cf. Bodkin v. Bodkin*, 388 S.C. 203, 225, 694 S.E.2d 230, 242 (Ct. App. 2010) (noting the spouse claiming property is part of the marital estate bears the burden of proof) (citation omitted).

Although, the presence and extent of personal or enterprise goodwill depends on the facts and circumstances of each case, there are numerous factors that can be examined to help identify the existence and extent of personal or enterprise goodwill. *BVR's Guide* at 91. First, the type of the business being valued can

often indicate the existence of personal or enterprise goodwill. *Id*. at 239. For example, an important factor is whether the business involves the manufacture or sale of goods, which can indicate enterprise goodwill, or whether the business involves delivering highly skilled or personal services, which may indicate personal goodwill. *Id*. at 87. Moreover, the nature or attributes of the particular industry may also impact the goodwill analysis; for example, "[d]entists have close contact [with their patients], [but] radiologists do not." *Id*. at 86. It is also important to consider how customers are drawn to the business, including whether customers return/repeat their business or whether transactions are largely non-recurrent and whether new business comes primarily from customer referrals or from advertising. *Id*. at 239. As to the company itself, factors to consider include whether the company is a start-up or a well-established business; whether the business has its own name or is named after an owner; the number of owners; and whether the operating systems and procedures are in-place or still in the process of being established. *Id*. In ascertaining whether any personal goodwill exists, it is also important to consider the personal characteristics of the owner, including the owner's personal reputation, community visibility, age and health, work habits, as well as the owner's education, experience in the industry, judgment, ability, and special skills or talents. *Id*. We underscore that this list of factors is not exhaustive or exclusive, but rather is included merely as a starting point to guide the family courts' inquiry. *See Crossland v. Crossland*, 408 S.C. 443, 453, 759 S.E.2d 419, 424 (2014) ("Formulaic principles and bright-line rules will only hinder the ability of family court judges to reach an equitable result in this individualized, fact-intensive area of law.") (quoting *Rimer v. Rimer,* 361 S.C. 521, 527, 605 S.E.2d 572, 575 (Ct. App. 2004)).

In separating personal and enterprise goodwill, the essential question is: can the business generate revenue from continued patronage without the current owner's participation? *BVR's Guide* at 239. We believe the following chart, which we have adapted from *BVR's Guide*, may be helpful in distinguishing personal and enterprise goodwill.

| Personal Goodwill Indicators | Enterprise Goodwill Indicators |
|---|---|
| • Small entrepreneurial business highly dependent on employee-owner's personal skills and relationships.<br>• No employment agreement between company and employee-owner. | • Larger business, which has formalized its organizational structures and institutionalized its systems and controls.<br>• Owner-employee has employment agreement with company. |

| | |
|---|---|
| • Personal service is an important selling feature in the company's product or services.<br>• No significant capital investment in either tangible or identifiable tangible assets.<br>• Only employee-owners own the company.<br>• Sales largely depend on the employee-owner's personal relationships with customers.<br>• Product and/or services know-how and supplier relationships rest primarily with the employee-owner. | • The business is not heavily dependent on personal services.<br>• The business has significant capital investments in either tangible or identifiable intangible assets.<br>• The company has more than one owner, some of whom are not employees.<br>• Company sales result from name recognition, sales force, sales contracts and other company-owned intangibles.<br>• Company has supplier contracts and formalized production methods, patents, copyrights, business systems, etc. |

*See id.* at 334.

Another factor in distinguishing between personal and enterprise goodwill is the degree to which a purported purchaser would demand the seller enter into a covenant not to compete. While a covenant not to compete may be present in any transaction, the market-driven necessity for a covenant is manifest where personal goodwill is involved.

In our research, we came across the following example, which we believe illustrates in a straightforward manner the essential difference between personal and enterprise goodwill based on the concept of marketability/transferability:

> To highlight the differences between these two components of goodwill, consider the following example of two hypothetical beauty salons, "Hair Now" and "Salon Pecan." The two salons, located a mile apart, have virtually identical ownership structures, assets, liabilities, revenues and net income. Beyond those similarities, the salons have little in common.
>
> Hair Now is at a busy intersection and serves customers on a walk-in basis. Profits are split evenly among the owners. In contrast, Salon

Pecan is in a secluded neighborhood and requires customers to make appointments, often weeks [in] advance, with a particular stylist. Profits are allocated based on the revenue generated by each owner.

Although both salons produce virtually identical benefits for their respective owners, there is a difference in the nature of the goodwill of Hair Now's owners versus that of Salon Pecan's owners. The owners of Hair Now receive earnings tied directly to the enterprise, such as its location, business model and mechanism for distributing profit. The owners of Salon Pecan, however, receive earnings tied directly to their personal skills, reputation and repeat clientele. Thus, an owner of Hair Now would typically possess a higher level of enterprise goodwill, and a Salon Pecan owner would have a higher level of personal goodwill.

In a business sale, a Hair Now owner would likely find it easier to transfer to a prospective buyer the goodwill associated with her ownership interest, due to the expectation that the earnings of Hair Now would continue at historical levels regardless of who was working in the business. However, an owner of Salon Pecan would likely have a harder time transferring her goodwill, due to the expected decline in earnings from the regular clients who are more loyal to her than to the salon.

Kotzin Valuation Partners, *Personal Goodwill vs. Enterprise Goodwill* (March 2009), available at http://www.kotzinvaluation.com/articles/goodwill.htm.

In the above example, the value of each beauty salon may be comprised of both personal and enterprise goodwill. However, any reasonable valuator would unquestionably conclude that personal goodwill predominates in Salon Pecan and enterprise goodwill predominates in Hair Now. For family court equitable division purposes, while distinguishing between enterprise and personal goodwill may at times prove to be difficult, the distinction between personal and enterprise goodwill based on transferability provides a workable framework for determining inclusion in, or exclusion from, the marital estate.

### D. Percentage of Goodwill Personal to Wife

Turning to the facts of this case, both parties challenge the family court's determination that 10% of the goodwill in Candelabra was personal goodwill

attributable to Wife. Wife claims the family court erred in understating her personal goodwill as only 10% of the total goodwill and contends that at least 25% of Candelabra's goodwill is personal to her. Husband counters that the family court erred in finding 10% of the total goodwill was personal to Wife because personal goodwill manifests itself only in professional practices, which Candelabra is not. Alternatively, Husband argues that if a portion of the goodwill is personal to Wife, because 80% of Candelabra's revenue is generated through sales from the website (which is not associated with Wife personally), then only the remaining 20% of sales generated in-store could be subject to any personal goodwill consideration.

As noted, Wife's valuation expert, Raymond McKay, opined that "at least" 20–25% of Candelabra's goodwill is personal to Wife. In reaching this conclusion, McKay collected data from the business records, visited the storefront in Mt. Pleasant, interviewed Wife and other Candelabra employees, and prepared a detailed report of the history of Candelabra's operations and pertinent financial information, along with discussions of various accounting and valuation methods and several issues surrounding the value of Candelabra's goodwill. In his valuation report, McKay explained that the factors supporting the existence of Wife's personal goodwill included: Wife's total responsibility for day-to-day management of the business; total control and responsibility for ongoing product selection; Wife's continuing website monitoring, revision, and presentation; Wife's direct personal contact and dealings with manufacturers and vendors; and Wife's formal, degreed college training in products marketing (with a minor in business administration), along with her extensive previous retail experience. McKay testified that without Wife, Candelabra would not have the ongoing ability to offer a current mix of trendy products and that sales would decline. McKay further opined that no bona-fide third-party purchaser would pay full fair market value for Candelabra without requiring a covenant not to compete from Wife, which signaled the existence of personal goodwill attributable to Wife.[9]

---

[9] Other courts have found the necessity of a covenant not to compete signals the existence of personal goodwill. *See, e.g.*, *Schmidt v. Schmidt*, 120 So. 3d 31, 33 (Fla. Dist. Ct. App. 2013) ("When valuing the enterprise goodwill of a business, the necessity of a covenant not to compete is significant as it signals the existence of personal goodwill, which cannot be included in determining the value assigned to the business for purposes of equitable distribution." (citations omitted)).

Wife's second valuation expert Jay Fishman, a nationally recognized expert on the valuation of closely held businesses, testified as to both the existence and extent of Wife's personal goodwill. Fishman explained that the value of any company is a function of what drives sales/profits in the specific way a particular business operates. After studying Candelabra's financial documents, conducting a thorough examination of Candelabra's website and several competitors' websites, and extensively interviewing various employees, vendors, and suppliers, Fishman concluded that the two major factors driving Candelabra's business were its website/internet presence and its desirable, on-trend product mix selected by Wife. Fishman also testified that, to a lesser extent, Candelabra's value is also attributable in part to its reputation for good customer service and its existing relationships with vendors and suppliers; however, Fishman identified product selection and accessibility on the internet as the most significant factors that drive the value of Candelabra. Fishman emphasized that the design/layout of the website and the product selection the site features are the critical elements that positively differentiate Candelabra from other retailers, prompting customers to purchase from Candelabra instead of another online retailer. Fishman emphasized that this differentiation is critically important when selling non-exclusive product on the internet like Candelabra does because "the competition is fierce [and] the barriers to entry here are rather low."[10]

Husband's valuation expert was Dr. Perry Woodside, who is also a superbly qualified expert in the field of business valuation. In researching how Candelabra's business operates, Woodside interviewed only Husband and did not visit the store or interview Wife or any other Candelabra employees. Woodside did not calculate personal goodwill as part of his valuation; however, on cross-examination, he candidly acknowledged that there was "some" personal goodwill in Candelabra but stated that it was "difficult to know" and if pressed to quantify it, then it would be between "5 to 10%." It was this opinion testimony from which the family court assigned Wife's personal goodwill at 10% of the value.

---

[10] Regarding Husband's contention that anyone could take over Wife's position at Candelabra and experience the same success, Fishman stated:

> That's a field of dreams. Businesses don't work that way. If you could do that, everybody would do it. . . . [Businesses] have to figure out a way. What differentiates me from the competition and [here] I think it's product selection, customer service, all those things, okay. . . . [I]t's [ludicrous] to think you can build this up, have someone else in there who is not really trained, and prosper.

We find the undisputed evidence is that some of the goodwill value was personal to Wife, especially in view of Woodside's acknowledgement that *some* personal goodwill existed. The evidence in the record as to Wife's role and involvement in the business, particularly in the area of product selection and format/design of the website, supports the conclusions of McKay and Fishman. Indeed, Wife's testimony was corroborated by that of current and former Candelabra employees and vendors who testified as to the significance of Wife's personal contributions to the business and the impact her unique talents and creativity had on the business. One employee even quipped that if Wife left, "it wouldn't be Candelabra. Whitney is Candelabra."

We reject Husband's contention on appeal that it is only through professional practices (such as doctors, dentists, accountants, attorneys, etc.) that a spouse can develop personal goodwill. *See Ward*, 755 S.E.2d at 500–01 (affirming family court's determination that one-third of husband's interest in logging business, which operated under the trade name of Advantage Timberland, Inc., was personal to husband and not enterprise goodwill where Husband possessed key personal relationships with employees and government regulators and performed his duties with exceptional skill and efficiency); *see also Hough v. Hough*, 793 So.2d 57, 58 (Fla. Dist. Ct. App. 2001) (affirming the family court's finding that 100% of goodwill in parties' business which owned and operated coin-operated air and vacuum machines on the premises of convenience stores and service stations was husband's personal goodwill because the company derived a large portion of its income from a handful of accounts that were freely or easily terminable by the customers and depended on husband's store of personal goodwill); *McQuay v. McQuay*, 217 P.3d 162, 164 (Okla. Civ. App. 2009) (reversing the lower court's inclusion of goodwill in the marital estate where the goodwill in the parties' concrete business was entirely attributable to husband's good reputation as a cement mason); *In re Marriage of Maxwell*, 876 P.2d 811, 813 (Or. Ct. App. 1994) (finding all goodwill in self-employed advertising copywriter's sole proprietorship was personal because the continued success of the business is completely dependent on the creative, personal services he provides).

In so finding, we acknowledge that several circumstances surrounding Candelabra's website indicate the presence of enterprise goodwill. First, the website's domain name, www.shopcandelabra.com, is associated with the business itself and is not specific to or associated with Wife personally. *Cf.* George Hawkins, *Personal Versus Practice Goodwill: A Visit to the "Plastics" Doc*, Fair Value, Vol. XX, No. 2, Summer/Fall 2013, at 5 (noting website or domain names

that are person-specific or promote an individual are not easily transferrable and suggest personal goodwill). Further, in connection with Candelabra's shift in business strategy, the website that initially began as a minor feature of Candelabra's overall marketing strategy was transformed into the central feature of all business operations, now serving as the online portal through which approximately 80% of all sales are placed. Indeed, all three experts agree that Candelabra's internet presence, through the SEO campaign and website format and functionality, significantly drives Candelabra's sales and overall value as a business. *See id*. at 4 (noting mass- and web-driven marketing strategies indicate enterprise goodwill).

Nevertheless, we categorically reject Husband's suggestion that because 80% of sales occur through the website, that somehow only 20% of Candelabra's value is attributable to in-store sales and is at play in determining personal goodwill. Husband cites no authority for the proposition that the presence of a website and internet sales precludes a finding of personal goodwill. To the contrary, the evidence establishes the presence of Wife's personal goodwill in the website in that Wife is solely responsible for the design and layout of the website and for selecting product to be featured on the website. *See In re Marriage of McTiernan & Dubrow*, 35 Cal. Rptr. 3d 287, 304 (Cal. Ct. App. 2005) (Boland, J., concurring) (explaining that artistic or creative talents are inherently personal and cannot be considered a divisible marital asset). Moreover, as Fishman noted in his testimony, appearing relevant to search engines such as Google through SEO strategies does not automatically translate into sales and profits if the website does not feature the product customers are looking to buy or is not structured in a way that customers can find the product they are looking for; rather, it is Wife's creative direction as to the website layout and her eye for design in picking products that convert Internet shoppers from mere visitors into purchasing customers.

Given our review of the record as a whole, we find the family court erred in finding only 10% of Candelabra's goodwill is personal to Wife. We assign 20% of the goodwill value to Wife's personal goodwill. We find support for this value in the testimony of McKay, who thoroughly studied and analyzed the issue and whose judgment on the matter we find most persuasive.

Wife argues we should dismiss Woodside's opinion because of the pressure Husband exerted on Woodside to value Candelabra as high as possible. We understand the games that are played in family court in the valuing of marital assets: the spouse expecting to receive an asset wants the asset valued as low as possible while the spouse not receiving the asset wants the asset valued as high as

possible. We further recognize in this case that Husband attempted to play this game, as evidenced by the series of emails he sent to Woodside imploring Woodside to assign a high value to Candelabra. In one email, Husband provided documents to Woodside and observed, "I am confident this material will continue to help build our valuation of Candelabra." In another email to Woodside, Husband stated, "You are the only offense I have. Let's keep the wheels turning and get me the value [I am] deserving for a company with this type of opportunity."

We are persuaded that Woodside, a highly respected expert, did not succumb to Husband's pressures. In fact, Husband admitted he argued with Woodside concerning a "multiplier" and "I fought him on it and he didn't give in." Therefore, we reject Wife's contention that we summarily dismiss the Woodside valuation. While we ultimately adopt most of the McKay valuation, we have carefully considered and respect the Woodside valuation. In fact, we accept Woodside's view that a marketability discount should not be utilized in valuing Candelabra. We add that a factor in our acceptance of most of the McKay valuation is the date of litigation value, which only McKay produced in a timely manner, a matter we discuss below.

### E. Date of Valuation

By statute, marital property subject to equitable distribution is presumptively valued at the date of the divorce filing. S.C. Code Ann. § 20-3-630(A). Nevertheless, the parties may be entitled to share in any appreciation or depreciation in marital assets occurring after the commencement of marital litigation but before the final decree. *Burch v. Burch*, 395 S.C. 318, 325, 717 S.E.2d 757, 761 (2011) (citation omitted). The burden of proof is on the party seeking a deviation from the statutory filing date. *Id.* at 329, 717 S.E.2d at 763.

In South Carolina, family and appellate courts look to whether there has been active or passive appreciation or depreciation of the marital assets when determining the proper date for valuation. *Id.* at 325, 717 S.E.2d at 761. "Passive appreciation refers to enhancement of the value of property due solely to inflation, changing economic conditions, or market forces, or other such circumstances *beyond the control of either spouse*." *Id.* at 325–26, 717 S.E.2d at 761 (emphasis added) (quotations and citation omitted). "[A]ctive appreciation, on the other hand, refers to financial or managerial contributions of one of the spouses." *Id.* at 326, 717 S.E.2d at 761 (quotations and citation omitted).

In valuing Candelabra, the family court found that although the date litigation commenced was in June 2011, the proper date for valuing Candelabra was June 2012. The family court reasoned that the growth of the business during the pendency of the litigation was due to the passive "market force of the internet." Moreover, the family court took a more generous view of Husband's contributions to the business than we do.

Even assuming Husband, as the family court found, "buoy[ed]" the "sinking ship" of Candelabra, such efforts occurred *before* the marital litigation was commenced. Husband was terminated from Candelabra prior to the filing date, and thereafter, by virtue of the temporary order, he was prohibited from making any decisions affecting the company. Because only post-filing activities impact the analysis of the active-passive distinction, we find Husband's actions prior to the filing date do not support a June 2012 valuation date. *See Burch*, 395 S.C at 327–28, 717 S.E.2d at 762 (noting that where the parties dispute the valuation date of a marital asset that has appreciated after the marital litigation filing date, only the spouses' post-filing activities matter in evaluating whether post-filing appreciation was active or passive and finding husband's post-filing activities in attending two trade shows did not amount to active efforts).

Further, it is not faithful to the record to attribute the success of Candelabra's website sales to mere "market forces" or existence of the internet. Rather, the evidence demonstrates that the continued growth in Candelabra's business between June 2011 and June 2012 was primarily attributable to Wife's active and continuing managerial efforts in selecting and arranging product on the website, in continuing to revise and refine the SEO campaign as to existing brands, and in expanding the SEO campaign to include new brands on the Candelabra website.[11]

Husband admitted the changing nature of Candelabra's business and acknowledged the importance of ongoing, active management for growth. Wife's valuation expert McKay outlined the distinction between active and passive changes in value and opined that the increase in Candelabra's value after the filing date was due to active forces, including Wife's managerial oversight, product selection, and marketing. We agree and find that the increase in Candelabra's value between June 2011 and

---

[11] The evidence in the record reveals that the website requires much more ongoing maintenance than the physical storefront; the SEO keywords are monitored, optimized, and indexed on a weekly or daily basis.

June 2012 was the result of Wife's active efforts.  Husband has thus failed to meet his burden of proving that the post-filing appreciation of Candelabra was due to passive forces.

As a result, we adhere to the statutory valuation date: the date of filing.  In this case, the valuation date closest to the filing date is June 30, 2011.

## F. Principles of Valuation

"When valuing business interests for the purpose of equitable distribution, the family court should determine 'the fair market value of the corporate property as an established and going business.'"  *Reid v. Reid*, 280 S.C. 367, 373, 312 S.E.2d 724, 727 (Ct. App. 1984) (quoting *Santee Oil Co. v. Cox,* 265 S.C. 270, 273, 217 S.E.2d 789, 791 (1975)).  "This is to be accomplished by considering the business' net asset value, the fair market value for its stock, and earnings or investment value." *Id*. (quotations and citations omitted).

The family court entered a scheduling order prior to trial, which required, among other things, the completion of written discovery in June 2012; the completion of mediation in July 2012; and the completion of depositions in August 2012; and set September 17, 2012, as the date of trial.  At the time of Woodside's deposition in August 2012, he was asked his opinion of Candelabra as of the 2011 date of filing.  Woodside had no opinion, for he only valued the business as of June 2012.  In short, for reasons we do not understand, Husband ignored the statutory valuation date.  Apparently in response to the deposition inquiry, Woodside at the last minute (a couple days before trial) produced a June 2011 valuation.  Husband offers no reason for failing to timely provide the date of filing valuation.

Wife asserts this violation of the scheduling order leaves only McKay's date of filing valuation for the family court and this Court to consider.  While Wife makes a compelling argument, we need not reach the question of the admissibility of Woodside's tardy date of filing valuation, for we would in any event adopt in large part the McKay valuation.

McKay considered in exacting detail the history of the company, examined the value of Candelabra from all approaches,[12] and balanced his opinion after weighing

---

[12] Guided by this Court's opinion in *Santee Oil Co*., McKay considered the adjusted net asset value, the excess earnings method, the capitalized earnings method, the discounted future benefits method, and the market approach and

the appropriate factors.  We do adopt a central feature of Woodside's analysis—the inappropriateness of using a lack of marketability discount in this case.[13]  We decline to impose a bright line rule regarding the appropriateness of such discounts in all family court business valuations, but we find no justification for discounting the value of Candelabra in this case due to lack of marketability.  Because Wife will retain ownership of Candelabra, we see no legitimate reason to indulge in the fiction of a marketability discount.[14]  *See Fausch v. Fausch*, 697 N.W.2d 748, 752–53 (S.D. 2005) ("Whether or not it is fair or appropriate to apply a [marketability] discount in a divorce case where no immediate sale is contemplated is . . . based upon the evidence of the case.") (citations omitted).

---

weighted each as to their relative bearing upon the value of the closely held company.  We believe this approach is most consistent with existing jurisprudence regarding valuation of closely held businesses.  *See Belk of Spartanburg, S.C., Inc. v. Thompson*, 337 S.C. 109, 116, 522 S.E.2d 357, 361 (Ct. App. 1999) (stating "[i]n *Santee* our supreme court determined three factors were ordinarily to be considered in a stock valuation case: (1) net asset value, (2) market value, and (3) the earnings or investment value of the dissenting stock.  After these factors have been considered, each is then weighted as to their relative bearing upon the ultimate determination of the fair value of the dissenting stock," and discounting the significance of appraisals that did not utilize all three methods or engage in weighting) (citing *Santee Oil Co.,* 265 S.C. 270, 217 S.E.2d 789).  While a traditional approach to valuation may often be dispositive in a family court setting, we recognize that flexibility must exist to allow our family court judges (and appellate courts under de novo review) discretion to fashion equitable relief under the facts and circumstances presented.

[13] The lack of a marketability discount was part of Woodside's June 2012 valuation and was in compliance with the scheduling order.  We also note that Wife's second expert, Fishman, also opined that he did not believe it was appropriate to apply a discount for a lack of marketability in determining Candelabra's value because there were no "exceptional circumstances" that would warrant such a discount, particularly where there was no contemplated sale of the business.

[14] McKay in his report noted the often-made argument that "since a sale of the company is not anticipated as a consequence of most divorce litigation, no [marketability discount] should apply."  McKay opted for a marketability discount, and understandably so, in his faithful adherence to the concept of "fair market value."  We do not address, and leave for another day, other discounts generally associated with determining fair market value.

## G. Apportionment of Candelabra

Equitable distribution of marital property "is based on the recognition that marriage is, among other things, an economic partnership." *Morris v. Morris*, 335 S.C. 525, 531, 517 S.E.2d 720, 723 (Ct. App. 1999). "Upon dissolution of the marriage, marital property should be divided and distributed in a manner which fairly reflects each spouse's contribution to its acquisition, regardless of who holds legal title." *Id*. Section 20-3-620(B) of the South Carolina Code provides factors for the family court to consider in apportioning marital property and instructs the family court to "give weight in such proportion as it finds appropriate" to each of the following factors:

> (1) the duration of the marriage together with the ages of the parties at the time of the marriage and at the time of the divorce . . . ; (2) marital misconduct or fault of either or both parties . . . ; (3) the value of the marital property . . . ; (4) the income of each spouse, the earning potential of each spouse, and the opportunity for future acquisition of capital assets; (5) the health, both physical and emotional, of each spouse; (6) the need of each spouse or either spouse for additional training or education in order to achieve that spouse's income potential; (7) the nonmarital property of each spouse; (8) the existence or nonexistence of vested retirement benefits for each or either spouse; (9) whether separate maintenance or alimony has been awarded; (10) the desirability of awarding the family home . . . ; (11) the tax consequences to each or either party . . . ; (12) the existence and extent of any support obligations, from a prior marriage . . . ; (13) liens and any other encumbrances upon the marital property . . . ; (14) child custody arrangements and obligations . . . ; and (15) such other relevant factors as the trial court shall expressly enumerate in its order.

S.C. Code Ann. § 20-3-620(B).

We find the most relevant apportionment factors in this case are: (1) Wife and Husband are in good health; (2) Wife and Husband are educated, able-bodied individuals, with many future years of strong earning potential, along with the corresponding absence of the need for separate maintenance or alimony; (3) Wife's disproportionately greater contributions towards enhancing the business of Candelabra by focusing her efforts on establishing lasting relationships and

ensuring long-term growth and stability, in addition to serving as the children's primary caregiver; (4) Wife being awarded full custody of the couple's two minor children; and (5) Husband's frequent rages, which although not the ultimate basis for the divorce, nonetheless contributed to the breakup of the marriage.

We have carefully considered these and all factors, and while awarding a greater share of the marital estate to Wife could be justified, we see no reason to set aside the family court's equal division of the marital estate. We, therefore, affirm the family court on the equal division and deny Wife's request for a greater share of the marital estate.

## H. The Value of Candelabra

Having set forth the analysis for the inclusion of enterprise goodwill in the marital estate, for an equal division of the value of Candelabra, and for the adoption of the McKay date-of-filing valuation, together with Woodside's proposal concerning the exclusion of a marketability discount, we set forth the value and establish the procedure for Wife to pay Husband for his remaining interest in the business.

As of the date marital litigation was filed, Candelabra had a value of $1,200,000. Subtracting from that figure the value of Candelabra's hard assets, which was $353,687,[15] we arrive at the value of Candelabra's goodwill, which is $846,313. Only 80%, or $677,050, of the overall goodwill value is enterprise goodwill includable in the marital estate. Thus, only $677,050 is a divisible marital asset, and Husband's 50% share of such enterprise goodwill is $338,525. Wife shall pay $338,525 to Husband together with interest at the rate directed by the family court. Interest shall be calculated from the date of the family court final decree.

Husband assigns error to the family court granting Wife five years to purchase Husband's interest. We agree and order that if Wife elects to retain ownership of the business, she shall make payment in full to Husband within ninety days from the sending of the remittitur to the family court.

---

[15] As noted, this Court has previously ordered Wife to pay Husband $176,843, which represented his 50% share of the hard-assets value.

# V.

We address the final assignments of error in summary fashion. Given our disposition of the value of Candelabra, we reverse the award to Husband of his expert witness fees.[16] While an appellate court retains the right to remand an award of fees and costs in light of changed beneficial results on appeal, we decline to order a remand in this case for the sole purpose of revisiting the expert witness fee award. *Compare Rogers v. Rogers*, 343 S.C. 329, 334, 540 S.E.2d 840, 842 (2001) (noting that in light of the remand on the substantive matter, the issue of attorney's fees was also remanded for reconsideration), *with Myers v. Myers*, 391 S.C. 308, 322, 705 S.E.2d 86, 94 (Ct. App. 2011) (modifying the family court's award of attorney's fees to Wife where the appellate court's decision diminished the beneficial results to Wife, rather than remanding to the family court). As a result, Wife shall not be responsible for any part of Husband's expert witness fees.

Husband argues that because Wife desires to retain ownership of Candelabra, she forfeited her ability to challenge the family court's value on appeal. Husband advances the "acceptance of benefits" doctrine in support of his position. Succinctly stated, the doctrine provides that when a party voluntarily accepts benefits provided to him under a decree, such acceptance acts as a waiver of his right to challenge the benefit on appeal. *See* 4 C.J.S. *Appeal & Error* § 62 (2007) ("Under some authority, voluntary compliance with a court's judgment moots appellate review, such as when an appellant accepts the benefits of or acquiesces in the judgment . . . ."). The doctrine does not apply here to foreclose Wife's ability to challenge the family court value on appeal. *See id*. ("However, it has also been held that voluntarily complying with a court order does not render an appeal moot. An appeal of a judgment is not rendered moot by a voluntary act that moots part of a claim, where the issue of liability or damages still remains.") (footnotes omitted); *see also* 5 Am. Jur. 2d *Appellate Review* § 587 (2007) ("[I]n order to be barred from appealing, a party must accept the benefits of the judgment under circumstances which indicate an intention to finally settle and compromise disputed claims."). This Court and the court of appeals routinely address such valuation challenges. The suggestion that a spouse in family court litigation who is

---

[16] *Doe v. Doe*, 370 S.C. 206, 220, 634 S.E.2d 51, 59 (Ct. App. 2006) (noting "[t]he same considerations that apply to awarding attorneys' fees also apply to awarding litigation expenses" and reversing the family court's award of expert witness fees) (citing *Ellerbe v. Ellerbe,* 323 S.C. 283, 298, 473 S.E.2d 881, 889 (Ct. App. 1996)).

awarded an asset has somehow waived the ability to challenge the asset's value on appeal borders on frivolity.  We dispose of Husband's argument under Rule 220, SCACR, as manifestly without merit.

## VI.

The order of the family court is affirmed in part and reversed in part.


**AFFIRMED IN PART, REVERSED IN PART.**

**TOAL, C.J., BEATTY and HEARN, JJ., concur.  PLEICONES, J., concurring in result only.**